Gloria Jackson ALLEN, et al,
Plaintiffs,

v.

Margie A. UTLEY, et al, Defendants.

Civ. A. No. 88–0545 (CRR).

United States District Court,
District of Columbia.

Jan. 17, 1990.

**2**

A. Palmer Ifill, Washington, D.C., for plaintiffs.

Peter C. Shaumber, Washington, D.C., for defendant American Security Bank.

John T. Henderson, Jr., Washington, D.C., for defendants Daniel A. King, Burnell Jordan, Herman K. Jordan, Alonzo Jordan, Joe Louis Jordan, and Van B. Hubbs.

CHARLES R. RICHEY, District Judge.

The extensive litigation in this case arose out of a dispute over two joint bank accounts that decedents Mr. and Mrs. King

had with one of the defendants American Security Bank ("ASB"), which resulted in ASB's refusing to honor one check in the amount of $20. By prior Order filed August 19, 1988, the Court granted summary judgment for ASB, then the only remaining defendant, and on appeal the United States Court of Appeals for this Circuit affirmed. The Court now has before it motions by ASB and other, previously dismissed, defendants for sanctions under Rule 11 of the Federal Rules of Civil Procedure or, in the alternative, for attorney's fees and costs. Having carefully considered the parties' papers and the overall flavor of this litigation, the Court will grant the defendants' motions and impose Rule 11 sanctions against the plaintiff and her attorney.[1]

## I. Background Facts

One of the defendants, Margie A. Utley, was the court-appointed conservator of the person of Mr. King before he died. She learned that Mrs. King was refusing to authorize payment of Mr. King's nursing home costs and was threatening to withdraw all of the money (totalling about $80,000) from their two ASB joint accounts and move to West Virginia. To protect Mr. King's interest in the accounts, Ms. Utley asked ASB whether she could withdraw any of the funds on Mr. King's behalf. When ASB called Mrs. King she reiterated her threat of withdrawing all of the funds.

Due to these conflicting demands, ASB froze the joint accounts pending an agreement between the two sides as to how the funds should be handled. The signature cards which the Kings had executed to set up their accounts as joint tenancies provided that, when faced with conflicting demands, ASB could require the signature of both joint tenants as a condition of withdrawal. However, instead of implementing the freeze by automatically refusing to honor all single-signature checks drawn upon the Kings' two accounts, ASB evaluated each check individually and dishonored

---

1. Throughout this Opinion, the Court sometimes will need to distinguish between the plaintiff and her attorney, and it will do so by specifically referring to them by name, Ms. Allen and Mr. Ifill respectively. Otherwise, when the Court uses the generic term "plaintiff," it is referring to the plaintiff and the attorney who represented her in these proceedings as one entity.

only one check signed by Mrs. King in the amount of $20.

Proceeding individually and as the personal representative of Mrs. King's estate, Mrs. King's daughter Gloria Jackson Allen sued ASB, Ms. Utley, and at least seven other defendants. The gravamen of her "Complaint for Wrongful Death, Breach of Contract, Pain and Suffering, Conversion, Negligence, Establishment of a Constructive Trust on Personal and Real Property and for Personal Injuries, and for Punitive Damages" was the surprising claim that ASB's actions in freezing the Kings' joint accounts killed Mrs. King. Almost four months after the Complaint was filed, the Court granted the plaintiff's motion to dismiss all of the defendants (most of whom were relatives of the plaintiff's decedent) except ASB.[2]

## II. Analysis

It is now well-established that the signature of an attorney on a pleading or motion "constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper [and] that to the best of the signer's knowledge, information, and belief formed *after reasonable inquiry* it is *well grounded in fact* and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Fed.R.Civ.Proc. 11 (emphasis added). As this language indicates, courts nowadays must in most instances apply the more stringent objective test of reasonableness under the circumstances at the time as opposed to the older subjective inquiry regarding counsel's good faith or lack thereof. *See* 1983 Advisory Committee Notes to Amended Rule 11; *Westmoreland v. CBS,* 770 F.2d 1168, 1177 (D.C.Cir.1985). After the 1983 amendment, it is

> [n]o longer … enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim. For the language of the new Rule

11 explicitly and unambiguously imposes an *affirmative duty* on each attorney *to conduct a reasonable inquiry* into the viability of a pleading before it is signed. Simply put, *subjective good faith no longer provides the safe harbor it once did.*

*Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985) (emphasis added).

Moreover, when Rule 11 is violated, a court *"shall* impose upon the person who signed, a represented party, *or both,* an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing …, including a reasonable attorney's fee." Fed.R.Civ. Proc. 11 (emphasis added). The district court is accorded wide discretion in determining whether factual reasons exist that require Rule 11 sanctions, "[f]or the district court has tasted the flavor of the litigation and is in the best position to make these kinds of determinations." *Westmoreland,* 770 F.2d at 1174. The flavor of this litigation has left such a bitter taste in the Court's mouth that it has no choice but to hold that sanctions are appropriate.

The way in which Ms. Allen and Mr. Ifill litigated this lawsuit is unsatisfactory in many respects, but their repeated failures to conduct anything approaching reasonable pre-filing inquiries and recognize that their claims were not well grounded in fact or law provide the bases for the Court's decision to impose sanctions. The plaintiff's case was an unlikely marriage of a breach of contract and a wrongful death claim, in which two factual issues—the contents of the Kings' signature cards with ASB and the actual cause of Mrs. King's death—played very important roles. The plaintiff's failures were particularly egregious with respect to these two crucial issues.

---

**2.** Upon examining a bundle of documents recovered from the Kings' house and in his possession for over one month, Mr. Ifill for the first time discovered what purported to be Mr. King's Last Will and Testament, which left all of Mr. King's real and personal property to his wife. Pursuant to District of Columbia law, Ms. Allen, as the heir at law and next of kin of Mrs. King (who predeceased Mr. King), took under this newly-discovered will. Therefore, the plaintiff dismissed her claims against all the other defendants.

## A. The Signature Cards

One of the plaintiff's main arguments was that ASB breached its contracts of deposit with Mrs. King by wrongfully freezing the two joint accounts she and her husband held. However, the plaintiff filed this suit without ever examining—or even attempting to examine—the signature cards Mrs. King and her husband executed to open the accounts. Thus, the plaintiff brought a breach of contract action without first reading the contract! While the legal relationship between the plaintiff's decedent and ASB was also governed, as this Court and the Court of Appeals both recognized, by applicable District of Columbia ("DC") Code provisions, the signature cards constituted the contracts of deposit upon which the plaintiff based her claim. The signature cards the Kings signed state that the depositors may withdraw funds individually "except in the event of *conflicting demands of depositors* the Bank may require *all* signatures" (emphasis added).

Under any set of circumstances, an objectively reasonable inquiry prior to filing this breach of contract action would have begun with—or at least included—an examination of these crucial signature cards, which delineated the contractual relationship between the Kings and ASB to the extent they did not conflict with applicable DC or federal law. Whether Ms. Allen was so intent on suing ASB that she purposely ignored the signature cards or whether she simply failed to comprehend their legal significance, Mr. Ifill had a duty as her attorney to look beyond whatever representations Ms. Allen may have made on this issue and satisfy himself that the contracts had indeed been breached.

The plaintiff argues that her pre-filing inquiry was adequate because the factual bases for ASB's successful defense were exclusively within the "unique knowledge" of ASB. However, even assuming, as the plaintiff contends, that the signature cards were kept and maintained by ASB, that does not affect the Court's conclusion that the plaintiff's pre-filing inquiry was woefully inadequate. What was especially unreasonable is that the plaintiff did not even *try* to examine the signature cards. There is no indication on this record that Ms. Allen or her attorney requested the opportunity to examine the signature cards and were rebuffed by ASB. In fact, the plaintiff has left unrebutted the affidavit of Kenneth Terwilliger, Vice President and Associate General Counsel for ASB, which states that after due and reasonable inquiry to the best of ASB's knowledge neither Ms. Allen nor Mr. Ifill, nor any of their representatives, ever requested copies of the signature cards the Kings executed. ASB Motion for Sanctions, Second Terwilliger Affidavit ¶ 4. Furthermore, although the plaintiff should have been aware of the "conflicting demands" provision before instituting this action, after Mr. Ifill finally did examine the signature cards,[3] the plaintiff again violated Rule 11 by filing papers before this Court and the Court of Appeals which continued to press a claim that by that point was clearly frivolous.

The plaintiff's recent filings opposing the defendants' motions for sanctions indicate that Ms. Allen and Mr. Ifill still have not realized the error of their ways. The plaintiff contends that the Complaint complied with Rule 11 because at the time it was filed there was a *prima facie* cause of action against ASB for its wrongful dishonor of Mrs. King's check in violation of D.C.Code § 28:4-402. The plaintiff argues that she alleged all of the requisite elements: (1) there were sufficient funds in the ASB account to pay the $20 check; (2) ASB did not honor the check; and (3) the plaintiff's special damages resulted. However, it takes only the most elementary legal analysis to recognize that one of the elements of this claim is some "wrongful" conduct by the bank. Not only does the first sentence of this code provision read: "A payor bank is liable to its customer for damages proximately caused by the *wrongful* dishonor of an item" but the title in-

---

3. Apparently, Mr. Ifill first examined the signature cards in the offices of ASB's counsel about six weeks after the Complaint was filed and immediately following the Court's initial status conference.

cludes the words *"wrongful* dishonor" in large bold letters. § 28:4–402 (emphasis added). The plaintiff thus omitted—and continues to omit—a crucial element of this section. An examination of the signature cards would have revealed that ASB's dishonor was not wrongful. Thus, the plaintiff's failure to conduct a reasonable pre-filing inquiry and the subsequent filing of papers continuing to press a claim which a reasonable attorney by. that point should have recognized was without factual and legal foundation require that the Court impose Rule 11 sanctions.

### B. The Cause of Mrs. King's Death

■ The second area tainted by the plaintiff's egregious misconduct was the claim that ASB's actions caused Mrs. King's death. In trying to hold ASB liable for Mrs. King's death, the plaintiff made various allegations—preposterous on this record—that ASB's decision to freeze Mrs. King's accounts and dishonor one of her checks: (1) prevented Mrs. King from obtaining nourishment and medications, which caused her serious illness, hospitalization, and resulting death; (2) caused her to become so depressed that she refused to eat, which led to her hospitalization and resulting death; and (3) caused her to "worry" herself to death.

These allegations are contradicted in so many ways on this record that the Court must conclude that the plaintiff did not conduct reasonable pre-filing inquiries and that the plaintiff should have realized, after these contradictions came to light, that her claim was not well grounded in fact. It was undisputed that the cause of Mrs. King's death, from a medical standpoint, was a pulmonary embolism occurring twelve days after she was hospitalized. Ms. Allen herself admitted at her deposition that: (1) Mrs. King's health improved considerably after she was admitted to the hospital; (2) Mrs. King's death was unexpected; (3) the doctors were "shocked of her dying"; and (4) Ms. Allen had been preparing to have Mrs. King discharged from the hospital. ASB's Memorandum in Support of Motion for Sanctions at 20–21 (quoting Allen Deposition Transcript at 94–96).[4] In addition, relatives and other people who regularly saw and spoke with Mrs. King indicated that she did not seem depressed about ASB's actions. *See* ASB's Motion for Sanctions, Second Hailstock Affidavit ¶ 10; Schaumber Affidavit ¶ 5; Fourth Sparling Affidavit ¶¶ 8, 9 & attached letter from Phillip Scantlebury. These statements by Ms. Allen and third parties familiar with Mrs. King demonstrate the lack of a factual basis for the plaintiff's shifting claims that ASB's actions proximately caused Mrs. King's death due to lack of food and medication, depression, or excessive worrying.[5]

In light of the plaintiff's repeated allegations that Mrs. King did not have enough money during the fall of 1987 to buy food and other necessities, a reasonable pre-filing inquiry should have included at least an attempt to obtain copies of the Kings' monthly bank statements, but neither Mr. Ifill nor Ms. Allen ever made such a request of ASB. An examination of these statements would have revealed that ASB honored two of the three checks presented after it had frozen the Kings' accounts. Moreover, at her deposition Ms. Allen herself testified she did not know that ASB

---

**4.** In its Memorandum in Support of Motion for Sanctions, ASB repeatedly refers to and quotes extensively from Ms. Allen's deposition transcript. Because this transcript has not been filed with the Court and because the plaintiff has not controverted any of the statements attributed to her by ASB, the Court will rely upon, and cite to, ASB's memorandum when discussing Ms. Allen's deposition testimony.

**5.** It should be noted that, if Mrs. King was depressed prior to her hospitalization during the fall of 1987, there are explanations more plausible than the plaintiff's attempt to blame ASB.

Just that summer, Mr. King went into the hospital and, according to her cousin, Mrs. King was "upset because of it" and relied on her husband "very much." ASB's Motion for Sanctions, Sparling Affidavit ¶ 4. Furthermore, Mrs. King's sister stated that she "has never been of the opinion that [ASB's] freezing of the Kings' accounts caused ... [Mrs.] King to worry herself to death" and that "Mrs. King's greatest concern in the Fall of 1987 was the court hearing about placing her and Mr. King in nursing homes." ASB's Motion for Sanctions, Fourth Sparling Affidavit ¶ 8.

had dishonored *any* of Mrs. King's checks. ASB's Memorandum in Support of Motion for Sanctions at 16 (quoting Allen Deposition Transcript at 119). About a week after the Complaint was filed but before Ms. Allen or Mr. Ifill ever requested any documents from her, the conservator Ms. Utley forwarded to Mr. Ifill a bank statement which revealed that during November 1987 Mrs. King had *over $13,000* in a Perpetual Savings Bank checking account. ASB's Motion for Sanctions, Second Utley Affidavit ¶¶ 3, 4 & attachments.

There are other important inconsistencies on the record that call into question the reasonableness of the plaintiff's pre-filing inquiry and the decision to continue to press her claim. The plaintiff never contacted Thomas Bradford, who was Mr. King's cousin and had known the King family for 45 years. ASB's Motion for Sanctions, Second Sparling Affidavit ¶¶ 2, 6. Had the plaintiff made this inquiry, she would have learned—as ASB did—that between the time when Mr. King died and Mrs. King went to the hospital Mr. Bradford visited Mrs. King two or three times a week to ensure her needs were met; that he would buy food for her, sometimes with his money and sometimes with hers; and that she never told him she needed money. ASB's Motion for Sanctions, Sparling Affidavit ¶¶ 5, 6; Second Sparling Affidavit ¶ 3.

Along similar lines, the plaintiff failed to make any inquiry of Cula Brown, Mrs. King's sister. ASB's Motion for Sanctions, Fourth Sparling Affidavit ¶¶ 2, 3(K). Information that Cula Brown gave ASB directly contradicts the plaintiff's claim that Mrs. King did not have enough money for food or basic necessities. According to Cula Brown, Mrs. King not only told her that Thomas Bradford was getting Mrs. King whatever she needed at the store but also never mentioned that she lacked for food or anything else. *Id.* at ¶ 3(F).

Finally, the plaintiff never contacted Doris Hailstock, Mrs. King's next door neighbor in a "close-knit neighborhood" who saw Mrs. King "all the time" and had known her for about thirty years. ASB's Motion for Sanctions, Second Hailstock Af-

fidavit ¶¶ 2, 3, 6, 11. The information supplied by Ms. Hailstock corroborates the statements discussed above made by Mrs. King's relatives and further contradicts the plaintiff's claims. Ms. Hailstock swears that "Mrs. King never said that she needed food or medication, she never complained about needing money." *Id.* at ¶ 10.

The Court acknowledges that a plaintiff is under no duty to exhaust every avenue of discovery before filing a lawsuit. *Cf. Olivieri v. Thompson,* 803 F.2d 1265, 1279 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). On the other hand, the foregoing summary of the record demonstrates that there were many pieces of evidence that were easily discoverable from readily identifiable sources. In addition, it is significant that the plaintiff's oppositions to the defendants' motions for sanctions neither dispute the information discussed above nor provide any mitigating circumstances for the plaintiff's misconduct. Thus, the Court concludes, without engaging in "20–20 hindsight," that a reasonable pre-filing inquiry should have uncovered at least some of this information, which seriously undermines the plaintiff's claim that Mrs. King had no access to money and was therefore deprived of nourishment and medication. Even assuming *arguendo* that the plaintiff's inquiry prior to filing the Complaint was reasonable, the plaintiff certainly violated Rule 11 by continuing to file papers pressing claims that—after the above information had come to light—were not well grounded in fact.

### C. Calculation of Sanctions

Having decided to grant the defendants' motions for Rule 11 sanctions, the Court must now determine the amount of those sanctions and upon whom they should be imposed. The Court will first address ASB, the main defendant throughout this litigation, and will then turn to the other defendants.

To arrive at the so-called "lodestar" figure that must be calculated for a judicial determination of "reasonable" attorney's fees, the Court must first fix the

number of hours reasonably spent on the litigation. *Save Our Cumberland Mountains, Inc., v. Hodel*, 857 F.2d 1516, 1522 (D.C.Cir.1988) (en banc). ASB successfully defended itself against the plaintiff's groundless suit in this Court and against the plaintiff's appeal in the Court of Appeals. This defense required ASB to engage in discovery and file numerous voluminous pleadings before this Court and the Court of Appeals.[6] ASB's defense throughout the course of this litigation was all the more time-consuming because it was forced to respond to the plaintiff's papers, which were often difficult to understand, vague, rambling, and misleading. ASB's submissions, on the other hand, were consistently of good quality. Thus, after careful examination of ASB's statements, the Court holds that it was reasonable for ASB to expend 391.35 hours of attorney time and 221 hours of law clerk time in defending against the plaintiff's claims.[7] *See* ASB's Reply to Plaintiff's Opposition to Motion for Sanctions, Statements (Exhibit B).

██ The next step is for the Court to determine a reasonable hourly rate, which is then multiplied by the reasonable number of hours spent to arrive at the lodestar figure. *Save Our Cumberland Mountains*, 857 F.2d at 1522. In this case, the Court is not faced with the more difficult task of determining a reasonable hourly rate for a "non-private law office" with no fixed billing rate. *Compare Laffey v. Northwest Airlines*, 746 F.2d 4 (D.C.Cir. 1984), *overruled on other grounds, Save Our Cumberland Mountains*, 857 F.2d at 1524. Instead, ASB engaged a private law office at a fixed billing rate. As the *Laffey* court stated:

> [W]hen fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding. *In almost every case, the firms' established billing rates will provide fair compensation.* The established rates represent the opportunity cost of what the firm turned away in order to take the litigation; they represent the lawyers' own assessment of the value of their time.

*Id.* at 24 (emphasis in original). Thus, when an attorney has a customary billing rate, that rate is the presumptively reasonable rate to be used in computing a fee award. *See Save Our Cumberland Mountains*, 857 F.2d at 1520.

ASB was billed for services rendered as follows: $150 per hour spent by lead counsel Mr. Peter Schaumber; $100 per hour spent by Mr./Ms. Modica, evidently Mr. Schaumber's associate; and $25/$30 per hour spent by Richard Sparling, a law school student working as Mr. Schaumber's law clerk. *See* ASB's Reply to Plaintiff's

**6.** The plaintiff argues that this Court does not have the authority to include, in an award of sanctions, attorney's fees based upon time spent by ASB defending its summary judgment victory from attack in the Court of Appeals. The Court disagrees. As has happened before during the course of this litigation, the cases cited by the plaintiff miss the mark, standing for nothing more than that appeals courts may impose sanctions for frivolous appeals, a proposition that this Court of course does not dispute. However, a district court is not prohibited from including time spent on appeal in its award of attorney's fees as sanctions under Rule 11. This Court did exactly that in the *Save Our Cumberland Mountains* litigation, *see* 622 F.Supp. 1160 (D.D.C.1985), and although the Court of Appeals subsequently expended considerable effort on the attorney's fee issue, it affirmed in almost all respects without in any way questioning this Court's authority to include the appellate work of attorneys in the sanctions award. *Save Our*

*Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43 (D.C.Cir.1987), *vacated*, 857 F.2d 1516 (D.C. Cir.1988) (en banc); *see also Westmoreland v. CBS*, 770 F.2d 1168, 1179–80 (D.C.Cir.1985) ("The calculation of the amount of the appellate attorneys' fee award can best be made by the district court.... Thus, in assessing attorneys' fees the district court should also include a reasonable attorneys' fee for the prosecution of the present appeal ..." (citations omitted)); *cf. Perkins v. Standard Oil Co.*, 399 U.S. 222, 90 S.Ct. 1989, 26 L.Ed.2d 534 (1970) (per curiam) (district court erred in holding that § 4 of Clayton Act barred district court from awarding appellate attorneys' fees).

**7.** The plaintiff has had ample time to controvert any of ASB's statements. However, other than generally stating that ASB's claimed attorneys' fees are "exorbitant," the plaintiff has not argued with specificity that the time spent by ASB's counsel was excessive or wasteful.

Opposition to Motion for Sanctions, Statements (Exhibit B). These rates, in the Court's view, are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). The Court has no reason to conclude that these rates are not reasonable, and disagrees with the plaintiff's unsupported statement that they are "exorbitant and excessive." Moreover, the Court approves of the staffing decision ASB's counsel made in utilizing a law clerk—at a much lower billing rate—to work slightly over one-third of the total hours billed to ASB.

Thus, the lodestar for ASB's representation, using the rates and hours discussed above, is $61,905.[8] The Court also concludes that under the circumstances this presumptively reasonable figure should not be increased by the use of any "multiplier."

■ The Court agrees with the plaintiff that the primary purpose of Rule 11 sanctions is not to compensate the victor at the expense of the vanquished but instead to punish past violations and deter future violations of Rule 11. *See Westmoreland v. CBS*, 770 F.2d 1168, 1179 (D.C.Cir.1985); Vairo, *Rule 11: A Critical Analysis*, 118 F.R.D. 189, 203–04 (1988). It is therefore appropriate for a court to consider the ability to pay of the person being sanctioned. *Johnson v. New York City Transit Auth.*, 823 F.2d 31, 33 (2d Cir.1987) (per curiam); *see Olivieri v. Thompson*, 803 F.2d 1265, 1281 (2d Cir.1986) (it lies well within district court's discretion to temper amount to be awarded against offending attorney by balancing consideration of his or her ability to pay), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

■ While the plaintiff has had more than ample time to supplement the record since ASB filed its statement of fees and costs in June 1989, Ms. Allen and Mr. Ifill have supplied the Court with very little specific information regarding their financial situations. They baldly contend that they are "Black persons who operate under financial restraints and cannot pay the fees charged by attorneys who represent financial institutions." Plaintiff's Opposition to ASB's Motions for Sanctions at 10. However, when any judge of the United States bases a ruling upon race, color, sex, or religion, for or against any party, such action could spell the end of a fair and impartial independent judiciary. That offending counsel and his client may have been of a minority race is no defense to these motions for Rule 11 sanctions and especially here, where they brought frivolous and unfounded claims against others of their own race, such as those defendants who were Mr. King's next-of-kin. Moreover, the plaintiff was on notice of the potential for Rule 11 sanctions by ASB's memorandum filed about two weeks before this Court granted summary judgment against the plaintiff. *See* ASB's July 29, 1989 Memorandum Regarding Rule 11 Sanctions.

■ Combing the record for more specific financial information, the Court discovered that Ms. Allen stands to receive a sum of money—in an amount unknown to the Court—once the assets of Mr. and Mrs. King's estates are distributed, although according to Ms. Allen, who is the personal representative of Mr. King's estate, his estate had an outstanding debt of over $79,000 as of August, 1988. Plaintiff's Response to Opposition of Defendant to Release of Funds ¶ 1. Furthermore, the record indicates that ASB has been holding funds of Mr. King's estate in an interest-bearing account that had a balance of over $51,000 in July 1988. ASB's Memorandum

---

**8.** The Court arrived at this figure as follows:

| | |
|---|---|
| 343.85 (Schaumber's hours) × $150 | = $51,577.50 |
| 47.5 (Modica's hours) × $100 | = $ 4,750.00 |
| 10.5 (Sparling's 1989 hours) × $30 | = $ 315.00 |
| 210.5 (Sparling's 1988 hours) × $25 | = $ 5,262.50 |
| Total | = $61,905.00. |

Apparently, during 1988, the time the law clerk, Mr. Sparling, worked was billed at $25 per hour, and during 1989 his time was billed at $30 per hour.

in Support of Motion for Order Permitting Deposit of Estate Funds into Registry of Court at 1. Finally, in February 1989, the plaintiff filed with the Superior Court an inventory report, as personal representative of Mr. King's estate, listing assets totalling over $185,000.[9] Attorney Fair's Memorandum in Support of Motion for Sanctions at 6–7. In view of the above, the Court holds that the deterrent purpose of Rule 11 and the interests of justice will best be served if the Court exercises its discretion to reduce the sanctions awarded to ASB to $50,000.

■ The final issue with regard to ASB's motion is who should be liable for the $50,000 awarded herein. "Courts seek to allocate sanctions between the attorney and the client according to their relative responsibility for the Rule 11 violation." *Borowski v. DePuy, Inc.*, 850 F.2d 297, 305 (7th Cir.1988). Not surprisingly, therefore, attorneys are usually held solely responsible when papers violate Rule 11 by being unwarranted by existing law or a good faith argument for the extension, modification, or reversal of existing law. *See id.;* Vairo, *Rule 11: A Critical Analysis*, 118 F.R.D. 189, 227 (1988). But that is not the case here because the Rule 11 violations in the instant case related, in the main, to the factual basis for the suit. Mr. Ifill certainly was culpable for failing to conduct reasonable pre-filing inquiries and failing to recognize, after certain factual information had come to light, that the claims asserted in papers filed throughout the litigation were not well grounded in fact. A reasonably competent attorney would have advised his or client that this suit was bound

to fail and would have refused to sign his or her name to the Complaint and subsequently-filed papers.

However, without absolving Mr. Ifill, his client Ms. Allen must receive her share of the blame for several reasons. The Court can reasonably assume that Mr. Ifill relied to a great extent on Ms. Allen's representations about the events leading up to Mrs. King's death. If Ms. Allen's deposition testimony—which is riddled with misleading statements and inconsistencies [10]—is any indication, the information she gave her attorney contributed to the filing and subsequent prosecution of this frivolous suit. Moreover, if ASB was able to obtain significant information about Mrs. King's pre-hospitalization mental state and financial situation from Mrs. King's relatives, then Ms. Allen, who was related to these same people, could presumably have assisted her attorney in obtaining this information as part of a reasonable prefiling inquiry. Thus, the Court holds that Mr. Ifill and Ms. Allen shall be liable, jointly and severally, to ASB in the amount of $50,000.

■ Six other defendants, who were all heirs at law and next of kin of the decedent Mr. King, have also filed a motion for Rule 11 sanctions. As baseless as this suit was against ASB, the plaintiff's decision to name these defendants (hereinafter "next-of-kin defendants") in this suit was even more frivolous. The Complaint alleged no tortious actions by any of these defendants that could in any way have caused Mrs. King's death nor did it allege that the next-of-kin defendants were stakeholders. The only nexus between the next-of-kin de-

---

9. Because it has been forced to cull these isolated insights into the plaintiff's financial situation from various documents in the record, the Court has no way of knowing how these bits of information interrelate. For example, the Court does not know whether the plaintiff's previously-filed inventory of the estate's assets includes the $51,000 held in the ASB account.

10. Just one of the many contradicted aspects of Ms. Allen's testimony relate to her long-distance telephone conversations with her mother. Ms. Allen testified that the frequency of their telephone conversations increased such that between September 15 and October 1, 1987, Mrs. King called her about five times a week. ASB's

Motion for Sanctions, Exhibit C at 1–2 (quoting Allen Deposition Transcript at 28–29). But long distance telephone records reveal that between December, 1986 and October 25, 1987 only eight calls were placed from Mrs. King's home telephone number in Washington, D.C. to Ms. Allen's home telephone number in Gary, West Virginia and that there were *no* such calls made between September 15 and October 1, 1987. *Id.* at 2 & Attachments to Fifth Sparling Affidavit. Significantly, the plaintiff has not even attempted to rebut or explain ASB's repeatedly raised claim that in this regard Ms. Allen gave false statements under oath.

fendants and this suit, at the time the Complaint was filed, was that they had potential possessory interests in Mr. King's estate. The Court agrees with the next-of-kin defendants that the Superior Court had jurisdiction over these kinds of estate administration issues. *See* D.C.Code Ann. § 11–921(a)(5)(A)(iii), (iv). Mr. King having apparently died intestate, one of these defendants had already begun to initiate probate proceedings in Superior Court. Attorney Fair's Memorandum in Support of Motion for Sanctions at 3. The plaintiff should have raised her concerns about the next-of-kin defendants' individual interests in estate property in that forum rather than trying to "piggy-back" her probate-related claims onto the groundless breach of contract/wrongful death action filed in this Court.

The Court therefore holds that these next-of-kin defendants' motion for Rule 11 sanctions shall be granted. Although their involvement in this suit was shorter and much more limited than ASB's, the next-of-kin defendants—all of whom reside some distance from this jurisdiction—had to retain an attorney, and some of them had to travel here to participate in their defense. Furthermore, their attorney Ms. Fair was required to expend time appearing before this Court, filing a motion to vacate default judgments that had been entered against several of the defendants, and filing a verified answer on the defendants' behalf. After carefully examining Ms. Fair's statement of services rendered, *see* Fair's Motion for Sanctions, Exhibit A at 6, the Court holds that the time expended (31.25 attorney hours, 28 law clerk hours, and 1 paralegal hour) in defending against the plaintiff's suit was reasonable. It was especially reasonable for the six next-of-kin defendants to retain one attorney to represent their similar interests.

The next step of the lodestar calculation, as discussed above, implicates the hourly rates actually charged by the next-of-kin defendants' privately-retained law office:

$150 per attorney hour, $50 per law clerk hour, and $35 per paralegal hour. *Id.* The quality of counsel's work product was good, and the Court holds that these rates fall within the brackets of "the rates charged by other firms for similar work in the community." *Save Our Cumberland Mountains,* 857 F.2d at 1519. The lodestar figure is thus $6,122.50,[11] which the Court will not increase by resorting to a multiplier. As with ASB's motion for sanctions, the Court will exercise its discretion and reduce to $5,000 the sanctions awarded to the next-of-kin defendants.

Finally, the Court must allocate responsibility between Ms. Allen and Mr. Ifill. On this issue, most of the Court's prior discussion of ASB's motion is also applicable here because the next-of-kin defendants probably would not have been involved in this groundless suit if the plaintiff had not brought it against ASB. The relative responsibility of Ms. Allen and Mr. Ifill for the Rule 11 violations is essentially the same with regard to the next-of-kin defendants as to ASB. Mr. Ifill should certainly have realized that there was no legal or factual basis for naming these individuals as defendants in this lawsuit and that Ms. Allen's probate-related concerns should instead have been raised in the Superior Court proceedings.

As in ASB's case, Ms. Allen must share the blame for bringing this suit in the first place. In addition, any of her concerns about the next-of-kin defendants having possessory interests in Mr. King's estate were rendered meaningless—and the case against these defendants was dismissed by the plaintiff—once Mr. King's will was discovered. *See supra* note 2. Even a lay person not well-versed in the law reasonably can be expected to know that when a relative dies, one of the major issues becomes whether the decedent had a will. A reasonable inquiry should have included a search for a will *before* the filing of the Complaint, and the failure to do so was especially significant in this case. Some

---

**11.** The Court's calculations are as follows:

| | | |
|---|---|---|
| 31.25 (attorney hours) × $150 | = | $4,687.50 |
| 28 (law clerk hours) × $50 | = | $1,400.00 |
| 1 (paralegal hour) × $35 | = | $ 35.00 |
| Total | = | $6,122.50. |

three months after the Complaint was filed and only at ASB's insistence, *see* ASB's Memorandum in Support of Motion for Sanctions at 3 n. 6, did Ms. Allen search the King's house and recover a bundle of papers, which contained (as was subsequently determined) Mr. King's will. Consequently, the Court, taking into account the flavor of the litigation, holds that Mr. Ifill and Ms. Allen shall be liable, jointly and severally, to the next-of-kin defendants collectively in the amount of $5,000.

In view of the size and amounts of attorney's fees awarded herein as Rule 11 sanctions, the parties and counsel are hereby advised that these awards subsume the element of allowable costs pursuant to 28 U.S.C. § 1920 *et seq.* and Fed.R.Civ.Proc. 54(d) and the relevant case law applicable to this discrete subject.

### III.  Conclusion

The Court does not enjoy imposing sanctions upon attorneys or their clients and does not do so lightly. However, the conduct of Mr. Ifill and Ms. Allen throughout this litigation and the mandate of Rule 11 of the Federal Rules of Civil Procedure leave this Court with no choice. As the Court's learned colleague from the Northern District of California, Judge Schwarzer, noted:

> Of all the duties of the judge, imposing sanctions on lawyers [and/or their clients] is perhaps the most unpleasant. A desire to avoid doing so is understandable. But if judges turn from Rule 11 and let it fall into disuse, the message to those inclined to abuse or misuse the litigation process will be clear. Misconduct, once tolerated, will breed more misconduct and those who might seek relief against abuse will instead resort to it in self-defense.

Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 205 (1985) (*quoted in Westmoreland v. CBS,* 770 F.2d 1168, 1180 (D.C.Cir.1985)). ASB and the next-of-kin defendants, as well as their attorneys, have been victimized by the misconduct of Mr. Ifill and Ms. Allen, who violated Rule 11 by failing to conduct reasonable pre-filing inquiries and continuing to file papers pressing claims that—if not frivolous to begin with—were certainly no longer well grounded in fact after significant pieces of information had come to light. Therefore, the Court will impose sanctions totalling $55,000, jointly and severally, on Mr. Ifill and Ms. Allen.

An Order in accordance with the foregoing Opinion will be issued of even date herewith.

### ORDER

In accordance with the Court's opinion of even date herewith, it is, by the Court, this 15th day of January, 1990,

ORDERED that American Security Bank's Motion for Rule 11 Sanctions shall be, and hereby is, GRANTED and that judgment shall be entered in favor of American Security Bank and against A. Palmer Ifill, Esq. and Gloria Jackson Allen, jointly and severally, in the amount of $50,000; and it is

FURTHER ORDERED that the Motion for Rule 11 Sanctions filed by Daniel A. King, Burnell Jordan, Herman K. Jordan, Alonzo Jordan, Joe Louis Jordan, and Van D. Hubbs ("next-of-kin defendants") shall be, and hereby is, GRANTED and that judgment shall be entered in favor of the next-of-kin defendants collectively and against A. Palmer Ifill, Esq. and Gloria Jackson Allen, jointly and severally, in the amount of $5,000.