In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3336

DENNIS MUHAMMAD, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CHRISTINE OLIVER, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 6887—**Blanche M. Manning**, *Judge*.

ARGUED MAY 5, 2008—DECIDED NOVEMBER 10, 2008

Before CUDAHY, POSNER, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*.    The plaintiffs have appealed from the dismissal of their suit for failure to state a claim. Fed. R. Civ. P. 12(b)(6). The suit is based on 42 U.S.C. § 1981, which provides in pertinent part that everyone "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." The appeal presents issues relating to pleading, res judicata, and the meaning of section 1981.

The principal plaintiff (the other plaintiffs needn't be discussed)—the Dennis Muhammad Community and

Economic Development Corporation (MDC)—is a minority business enterprise. The defendants are the nonprofit Chicago Dwellings Association (CDA), the for-profit CDA Management (CDAM), and Christine Oliver, the chief executive officer of both defendant companies. MDC and CDAM signed a joint-venture agreement to bid on a contract to install air conditioners in buildings owned by the Chicago Housing Authority. The joint venture's bid was successful, but MDC and the defendants had a falling out and in 2002 MDC sued CDA and CDAM in an Illinois state court charging breach of contract. CDA and CDAM had, the suit charged, violated the joint-venture agreement by refusing to permit MDC to do the share of the installation work that the agreement allotted to it. CDA moved to be dismissed from the suit because it had not signed the contract. The judge granted the motion. In 2005, MDC moved to dismiss its suit (the record does not indicate why)—which now was just against CDAM—and the judge granted that motion too and dismissed the suit without prejudice.

Two years later MDC brought the present suit, this one in federal court, alleging the same violations of the joint-venture agreement but adding that CDA, CDAM, and Oliver (who had not been named as a defendant in the previous suit) had treated MDC as a "minority front." That is, they had used MDC's participation in the bid to increase the likelihood that CDAM would be the successful bidder for the contract with the Chicago Housing Authority but had never intended to allow MDC to do any of the work called for by the contract. This is the conduct alleged in the present suit to violate section 1981.

The district judge held that the dismissal of the first suit barred the present one so far as the company defendants were concerned and that although the claim against Oliver was not barred by res judicata, because she had not been a party to the first suit, she could not be held liable for violating section 1981 because she had not been a signatory of the joint-venture agreement.

The two suits were based on different legal theories—the first on state contract law, the second on a federal civil rights statute—but both arose out of the same facts, namely conduct by the defendants that is alleged to have violated the joint-venture agreement to the prejudice of MDC, the plaintiff in both suits. Ordinarily a second suit arising from the same events as the first one is barred only if there was a final judgment, with prejudice, in the first suit; and the final judgment in the first suit was without prejudice. But when a suit is abandoned after an adverse ruling against the plaintiff, the judgment ending the suit, whether or not it is with prejudice, will generally bar bringing a new suit that arises from the same facts as the old one. "[A] plaintiff who splits his claims by voluntarily dismissing and refiling part of an action after a final judgment has been entered on another part of the case subjects himself to a *res judicata* defense." *Hudson v. City of Chicago*, 889 N.E.2d 210, 217 (Ill. 2008). When a "final judgment rendered in an action extinguishes the plaintiff's claim," in this case against CDA, which the judge had dismissed from the case en route to entering the final judgment dismissing the entire case, "the claim extinguished includes all rights of the plaintiff to remedies against the defendant with

respect to all or any part of the transaction . . . out of which the action arose." *Restatement (Second) of Judgments* § 24(1) (1982). Otherwise "any plaintiff could file an action with multiple counts, dismiss some but not all of the counts, obtain a final judgment on the undismissed counts, and if unsuccessful on the counts not dismissed, refile the previously dismissed counts. Such a practice would impair judicial economy and would effectively defeat the public policy underlying *res judicata*." *Rein v. David A. Noyes & Co.*, 665 N.E.2d 1199, 1208 (Ill. 1996).

And if as in this case there are multiple defendants, the extinction of the claim against one (CDA) extinguishes the plaintiff's claim against the others (CDAM and Oliver) if the claim against them arose out of the same facts as the first claim, as is true in this case. Otherwise a plaintiff could litigate the same claim indefinitely by suing one joint tortfeasor after another. *Evans ex rel. Evans v. Lederle Laboratories*, 167 F.3d 1106, 1113 (7th Cir. 1999) (Illinois law). It is true that *Evans* was distinguished in *Hendricks v. Victory Memorial Hospital*, 755 N.E.2d 1013, 1015 (Ill. App. 2001), on the ground that while in *Evans* "all three defendants were potentially liable for exactly the same conduct: providing the vaccine to plaintiffs' son . . . here plaintiffs' causes of action against Sipos and Victory, while relating in a general way to the same conduct, allege separate activities." But in the present case all three defendants are sought to be held liable for the identical conduct, namely the creation of a "minority front" in derogation of the plaintiff's rights.

The plaintiff points out that if "the parties have agreed in terms or in effect that the plaintiff may split his claim,"

*Restatement*, *supra*, § 26(1)(a), the bar of res judicata is lifted, which according to the plaintiff is the situation here. Its brief states that the defendants' lawyer "proposed that both sides [in the state court suit] agree to voluntarily withdraw their claims, and that all parties execute a standstill agreement to ensure that their legal rights would not be harmed in any way by the voluntary agreement to withdraw the lawsuit. Both sides agreed to this arrangement, and signed a standstill agreement."

The only support for this statement that the plaintiff offers is a paragraph in the complaint which says that one of the defendant's lawyers suggested such an agreement. The complaint does not say that the agreement was ever actually made, and the record contains no text of any such agreement. At argument the plaintiff's lawyer stated that the agreement is in a box of documents that he has not looked at. The excruciatingly long complaint contains 322 paragraphs; if there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening. See *Evancho v. Fisher*, 423 F.3d 347, 354-55 (3d Cir. 2005); *Cline v. Rogers*, 87 F.3d 176, 184 (6th Cir. 1996).

For a plaintiff's lawyer who believes that his client has a document that shows his suit was not barred to fail to read it is neglect on a par with failing to conduct the preliminary investigation that a plaintiff must conduct before he can bring a suit. Fed. R. Civ. P. 11(b)(3); see, e.g., *Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274, 280 (7th Cir. 1989). And for the lawyer not to have read

the document before the appeal was argued was a stunning failure to assist this court in the proper disposition of the appeal. See, e.g., *id*. at 280; *Medical Emergency Service Associates, S.C. v. Foulke*, 844 F.2d 391, 399-400 (7th Cir. 1988); *Allen v. Utley*, 129 F.R.D. 1, 4-5 (D.D.C. 1990).

The plaintiff cannot defeat the application of res judicata by arguing that the judge in the first suit, by allowing the plaintiff to dismiss it voluntarily and without prejudice, "expressly reserved the plaintiff's right to maintain the second action." *Restatement*, *supra*, § 26(1)(b). Such a dismissal does not "expressly" reserve anything. *Rein v. David A. Noyes & Co.*, *supra*, 665 N.E.2d at 1207-08. Nor was it improper for the district judge to invoke res judicata even though the defendants had failed to argue it. The doctrine "'is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste.'" *Arizona v. California*, 530 U.S. 392, 412 (2000).

It is true that res judicata is not one of the affirmative defenses that Rule 12(b) permits to be made by motion rather than in the answer to the complaint. But when an affirmative defense is disclosed in the complaint, it provides a proper basis for a Rule 12(b)(6) motion. (For the general principle see *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Walker v. Thompson*, 288 F.3d 1005, 1009-10 (7th Cir. 2002), and *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003), and for its application to the defense of res judicata see *In re Colonial Mortgage Bankers Corp.*, 324

F.3d 12, 20 (1st Cir. 2003).) This proposition is entailed by the principle that a plaintiff can plead himself out of court. E.g., *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008); *American Nurses' Ass'n v. Illinois*, 783 F.2d 716, 724 (7th Cir. 1986). No purpose would be served by compelling the defendant to file an answer rather than proceed by motion when the plaintiff has pleaded the answer himself.

The remaining issue is Christine Oliver's possible liability for violating 42 U.S.C. § 1981. The judge's ground for excusing her was erroneous because the fact that she was not a party to the joint-venture agreement was irrelevant. The statute gives nonwhites the same right to make and enforce contracts as whites have. For the Ku Klux Klan to beat up nonwhites who try to enforce their contracts violates the statute even though the Klan is not a party to the contracts. *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993, 1007-08 (S.D. Tex. 1981). That is to say that tortious interference with contract rights violates section 1981 when the motivation for the interference is racial. See *CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1955 (2008); cf. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236 (1969); *Shaikh v. City of Chicago*, 341 F.3d 627, 630-31 (7th Cir. 2003); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975). And that is what Oliver is accused of: using her authority as CDAM's chief executive officer to cause, for racial reasons, MDC's contractual rights to be violated.

But the claim fails for several independent reasons. The first is the principle of the *Evans* case: that you cannot

refile a suit based on the same facts against a defendant whom you could have sued but did not sue in your first suit. Second is the rule of *Towns v. Yellow Cab Co.*, 382 N.E.2d 1217, 1221-23 (Ill. 1978). As we explained in *Bachenski v. Malnati*, 11 F.3d 1371, 1377-78 (7th Cir. 1993) (footnotes and citations omitted), "when *respondeat superior* is the sole asserted basis of liability against a master for the tort of his servant an adjudication on the merits in favor of either the master or servant precludes suit against the other. The rule developed as an offshoot of the doctrine of *res judicata.* Although a master and his servant are not technically in privity, the preclusive principles underlying *res judicata* were thought to have equal application in the *respondeat superior* setting because the operative facts and law controlling a servant's direct liability are always identical to those that determine the vicarious liability of his master (so long as the agency relationship and its scope are not in dispute). If the master is vicariously liable, the servant must be directly liable (and vice versa); if the master is not vicariously liable, the servant cannot be directly liable (and vice versa). The *Towns* doctrine is established law in Illinois." (And not only in Illinois; see *Peppmeier v. Murphy*, 708 N.W.2d 57, 63-64 (Iowa 2005); *Restatement*, *supra*, § 51.)

So if you are hit by a truck and sue the truck company and lose, you cannot resuscitate your claim by suing the truck driver unless the company's successful defense in the suit against it was a defense personal to the company. *Id.*, § 51(1)(b), and illustration 1. If the company won its case because the jury determined that the driver had not been negligent and therefore his employer was not liable

under the doctrine of respondeat superior, that would extinguish the claim against the driver because the previous suit had exonerated him.

One might suppose that the principle which drove the result in *Towns* was not res judicata (claim preclusion) but collateral estoppel (issue preclusion)—the driver was relying on the issue of his liability having been resolved in the suit against his employer. But then he would have to show that the issue had been resolved in a full and fair hearing, *Herzog v. Lexington Township*, 657 N.E.2d 926, 929-30 (Ill. 1995), whereas if the suit against him is deemed a case of claim splitting all he has to show is that the liability unsuccessfully asserted against his employer in the previous suit was derivative from liability of himself. As the *Restatement* explains (elaborating on the reasoning in the *Towns* opinion), the courts rightly treat the second suit as an attempt at claim splitting, for

> in an important sense . . . there is only a single claim. The same loss is involved, usually the same measure of damages, and the same or nearly identical issues of fact and law. The substantive legal basis for vicarious responsibility rests largely on the notion that the injured person should have the additional security for recovery of his loss that is represented in imposition of liability on a person other than the primary obligor. The optional additional security thus afforded by rules of vicarious responsibility should not, however, afford the injured person a further option to litigate successively the issues upon which his claim

to redress is founded. . . . [I]f he is allowed to sue the second obligor after having lost an action against the first, two anomalous consequences may result. First, he may be given recovery for conduct that has already been determined not to be wrongful. Second, if the first action is unsuccessfully maintained against the primary obligor, and the second successfully maintained against the person vicariously responsible, it could happen that the latter could obtain indemnity from the primary obligor. The result would be that the primary obligor would have to pay indirectly an obligation from which he had been directly exonerated.

For these reasons, the rules of res judicata applicable in this situation should approximate those that govern when the same claim is successively asserted against a single defendant . . . .

*Restatement*, *supra*, § 51, comment b.

Oliver corresponds to the truck driver. CDAM's liability is derivative from hers, because she is alleged to have been the moving force in its alleged violation of the plaintiff's rights. If there was no violation by CDAM, she is off the hook. But a complication arises from the fact that the dismissal of CDAM from the previous suit was not an adjudication on the merits—that is, it was not res judicata (in English, "matter adjudicated")—as *Towns*, and its paraphrase in *Bachenski*, require. 382 N.E.2d at 1221-22. It was a voluntary dismssal, which under *Towns* is not an adjudication on the merits. *Id*. But remember that when a plaintiff abandons a suit after an adverse ruling

(in this case, the dismissal of MDC's claim against CDA), the abandonment, though a voluntary dismissal, is res judicata.

We are a little puzzled by the statement in *Bachenski*, echoing *Towns*, 382 N.E.2d at 1221, that master and servant are not in privity. If they are, a final judgment in a suit against one would bar a suit against the other without regard to the doctrine of *Towns*; indeed, the doctrine would be supererogatory. The Illinois courts define privity in a fashion that would seem to embrace any master-agent case: "'Privity exists between two parties who adequately represent the same legal interests.' 'It is the identity of interest that controls in determining privity, not the nominal identity of the parties.' 'A nonparty may be bound under privity if his interests are so closely aligned to those of a party that the party is the virtual representative of the nonparty.'" *Illinois Non-Profit Risk Management Ass'n v. Human Service Center*, 884 N.E.2d 700, 721 (Ill. App. 2008) (citations omitted). "Even if a plaintiff's right to relief arises from what is realistically viewed as a single episode, if it is a right against multiple parties—joint tortfeasors, if the right arises under tort law—he needn't join them in one suit, unless there is privity among those parties, for in that event separate suits against them are treated as the equivalent of separate suits against the same party. 'Privity' in this context means that because the parties have by virtue of contract or otherwise identical interests, a claim or defense by one is equivalent to a claim or defense by all." *Manicki v. Zeilmann*, 443 F.3d 922, 926 (7th Cir. 2006) (citations omitted) (Illinois law). Again, that seems

a good description of the master-servant case. And there are cases that hold explicitly that an agent and his principal are in privity, e.g., *McKinney v. City of East St. Louis*, 188 N.E.2d 341, 343 (Ill. App. 1963); *Garcia v. Village of Mt. Prospect*, 360 F.3d 630, 636 (7th Cir. 2004) (Illinois law), and the master-servant relationship is a standard example of a principal-agent relationship.

But we needn't explore the tension (or is it overlap?) between the concept of privity and the rule of *Towns* more deeply; for all else to one side, the complaint does not disclose an interference on racial grounds with MDC's contract with CDAM, and so fails, against Oliver as against the other defendants, regardless of preclusion. The longer and more detailed a complaint is, the more compelling the inference that any omission from it was deliberate and should bind the plaintiff. See *Bender v. Suburban Hospital, Inc.*, 159 F.3d 186, 192 (4th Cir. 1998). A 322-paragraph complaint should be assumed to have thrown everything the plaintiff had at the defendant, including the kitchen sink; it ill becomes the plaintiff later to say, after the defendant and the trial judge have picked the complaint apart, that the omission from the complaint of an essential element of a claim should be deemed inadvertent and inconsequential. The complaint alleges that the defendants were seeking a "minority front" to bolster their bidding prospects and had no intention of sharing the work with the plaintiff if the bid was successful. To provide favored treatment to black-owned businesses is to discriminate in favor of rather than against blacks, and while to cheat them of an opportunity for that favored treatment is disreputable

behavior it does not disfavor them vis-à-vis whites; it removes rather than creates a racial preference. Section "1981 establishes a rule against discrimination in contracting and does not create any entitlement to be the beneficiary of a contract reserved for firms owned by specified racial, sexual, ethnic, or religious groups." *Rapid Test Products, Inc. v. Durham School Services, Inc.*, 460 F.3d 859, 860 (7th Cir. 2006); see *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 248-50 (6th Cir. 2006); *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 708 (9th Cir. 1997).

This would be a different case if the defendants would not have cheated similarly situated whites, for example, white women. (Woman-owned businesses can also seek affirmative-action set asides to improve their prospects of obtaining contracts with the City of Chicago.) Imagine the following case. An unscrupulous contractor who dupes a minority-owned business into serving as a "minority front," with a false promise that it would share in the contractor's contract with the City, *because* their owners, employees, or subcontractors are black has deprived the business of a contractual opportunity because of race. But if the unscrupulous contractor would if he could dupe *any* business that qualifies for a set aside (it might be a business owned by women, by disabled persons, or perhaps even by veterans), then he is not discriminating on racial grounds when he dupes the minority-owned business. He is indifferent to the race of his victims; all he cares about is whether they can help him get a contract by virtue of their qualifying to participate in a set-aside program and if he gets the

contract whether he can then stiff them. That is this case. There is no suggestion that the defendants want to make life difficult for blacks; they would have been happy to dupe a "woman front" rather than a "minority front."

The section 1981 count of the complaint, as summarized by the plaintiffs, alleges that "the Defendants exploited the Plaintiff corporation's Minority Business Enterprise status by inducing the Plaintiffs to form a Joint Venture with the Defendants' corporations for the purpose of obtaining contracts from the Chicago Housing Authority, and then using their financial clout to force the Plaintiff-Appellants into the role of being a mere minority front. The Plaintiff-Appellants further alleged that under this scheme, the Defendant-Appellees took all of the profits from the Joint Venture for themselves, despite the fact that the Plaintiffs' corporation was legally a 51% owner of the Joint Venture." This is an accusation of greed, not of racial discrimination. The defendants in their brief so characterized it, and the plaintiffs in their reply brief did not quarrel with the characterization.

The judgment of dismissal is

AFFIRMED.