# ARIZONA *v.* CALIFORNIA

No. 8, Orig.   Argued April 25, 2000—Decided June 19, 2000

394

Ginsburg, J., delivered the opinion of the Court, in which Stevens, Scalia, Kennedy, Souter, and Breyer, JJ., joined. Rehnquist, C. J., filed an opinion concurring in part and dissenting in part, in which O'Connor and Thomas, JJ., joined, *post*, p. 422.

*Jeffrey P. Minear* argued the cause for the United States. With him on the briefs were *Solicitor General Waxman, Assistant Attorney General Schiffer,* and *Deputy Solicitor General Kneedler.*

*Mason D. Morisset* argued the cause for defendant Quechan Indian Tribe. With him on the briefs was *K. Allison McGaw.*

*Jerome C. Muys* argued the cause for the State parties. With him on the briefs were *Bill Lockyer,* Attorney General of California, *Richard M. Frank,* Chief Assistant Attorney General, *Mary B. Hackenbracht,* Assistant Attorney General, *Douglas B. Noble,* Deputy Attorney General, *Michael Pearce, Steven B. Abbott,* and *Karen L. Tachiki.**

---

**John M. Lindskog* filed a brief for the West Bank Homeowners Association as *amicus curiae.*

JUSTICE GINSBURG delivered the opinion of the Court.

In the latest chapter of this long-litigated original-jurisdiction case, the Quechan Tribe (Tribe) and the United States on the Tribe's behalf assert claims for increased rights to water from the Colorado River. These claims are based on the contention that the Fort Yuma (Quechan) Indian Reservation encompasses some 25,000 acres of disputed boundary lands not attributed to that reservation in earlier stages of the litigation. In this decision, we resolve a threshold question regarding these claims to additional water rights: Are the claims precluded by this Court's prior decision in *Arizona* v. *California*, 373 U. S. 546 (1963) *(Arizona I)*, or by a consent judgment entered by the United States Claims Court in 1983? The Special Master has prepared a report recommending that the Court reject the first ground for preclusion but accept the second. We reject both grounds for preclusion and remand the case to the Special Master for consideration of the claims for additional water rights appurtenant to the disputed boundary lands.

I

This litigation began in 1952 when Arizona invoked our original jurisdiction to settle a dispute with California over the extent of each State's right to use water from the Colorado River system. Nevada intervened, seeking a determination of its water rights, and Utah and New Mexico were joined as defendants. The United States intervened and sought water rights on behalf of various federal establishments, including five Indian reservations: the Chemehuevi Indian Reservation, the Cocopah Indian Reservation, the Fort Yuma (Quechan) Indian Reservation, the Colorado River Indian Reservation, and the Fort Mojave Indian Reservation. The Court appointed Simon Rifkind as Special Master.

The first round of the litigation culminated in our opinion in *Arizona I*. We agreed with Special Master Rifkind that

the apportionment of Colorado River water was governed by the Boulder Canyon Project Act of 1928, 43 U. S. C. §617 *et seq.*, and by contracts entered into by the Secretary of the Interior pursuant to the Act. We further agreed that the United States had reserved water rights for the five reservations under the doctrine of *Winters* v. *United States*, 207 U. S. 564 (1908). See *Arizona I*, 373 U. S., at 565, 599–601. Because the Tribes' water rights were effective as of the time each reservation was created, the rights were considered present perfected rights and given priority under the Act. *Id.*, at 600. We also agreed with the Master that the reservations' water rights should be based on the amount of practicably irrigable acreage on each reservation and sustained his findings as to the relevant acreage for each reservation. *Ibid.* Those findings were incorporated in our decree of March 9, 1964, which specified the quantities and priorities of the water entitlements for the States, the United States, and the Tribes. *Arizona* v. *California*, 376 U. S. 340. The Court rejected as premature, however, Master Rifkind's recommendation to determine the disputed boundaries of the Fort Mojave and Colorado River Indian Reservations; we ordered, instead, that water rights for those two reservations "shall be subject to appropriate adjustment by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." *Id.*, at 345.

In 1978, the United States and the State parties jointly moved this Court to enter a supplemental decree identifying present perfected rights to the use of mainstream water in each State and their priority dates. The Tribes then filed motions to intervene, and the United States ultimately joined the Tribes in moving for additional water rights for the five reservations. Again, the Court deferred resolution of reservation boundary disputes and allied water rights claims. The supplemental decree we entered in 1979 set out the water rights and priority dates for the five reservations

under the 1964 decree, but added that the rights for all five reservations (including the Fort Yuma Indian Reservation at issue here) "shall continue to be subject to appropriate adjustment by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." *Arizona* v. *California*, 439 U. S. 419, 421 *(per curiam)*. The Court then appointed Senior Circuit Judge Elbert P. Tuttle as Special Master and referred to him the Tribes' motions to intervene and other pending matters.

Master Tuttle issued a report recommending that the Tribes be permitted to intervene, and concluding that various administrative actions taken by the Secretary of the Interior constituted "final determinations" of reservation boundaries for purposes of allocating water rights under the 1964 decree. (Those administrative actions included a 1978 Secretarial Order, discussed in greater detail *infra*, at 404–405, which recognized the Quechan Tribe's entitlement to the disputed boundary lands of the Fort Yuma Reservation.) Master Tuttle also concluded that certain lands within the undisputed reservation boundaries but for which the United States had not sought water rights in *Arizona I*—the so-called "omitted lands"—had in fact been practicably irrigable at the time of *Arizona I* and were thus entitled to water. On these grounds, Master Tuttle recommended that the Court reopen the 1964 decree to award the Tribes additional water rights.

In *Arizona* v. *California*, 460 U. S. 605 (1983) *(Arizona II)*, the Court permitted the Tribes to intervene, but otherwise rejected Master Tuttle's recommendations. The Secretary's determinations did not qualify as "final determinations" of reservation boundaries, we ruled, because the States, agencies, and private water users had not had an opportunity to obtain judicial review of those determinations. *Id.*, at 636–637. In that regard, we noted that California state agencies had initiated an action in the United States District Court for the Southern District of California chal-

lenging the Secretary's decisions, and that the United States had moved to dismiss that action on various grounds, including sovereign immunity. "There will be time enough," the Court stated, "if any of these grounds for dismissal are sustained and not overturned on appellate review, to determine whether the boundary issues foreclosed by such action are nevertheless open for litigation in this Court." *Id.*, at 638. The Court also held that the United States was barred from seeking water rights for the lands omitted from presentation in the proceedings leading to *Arizona I;* "principles of res judicata," we said, "advise against reopening the calculation of the amount of practicably irrigable acreage." 460 U. S., at 626. In 1984, in another supplemental decree, the Court again declared that water rights for all five reservations "shall be subject to appropriate adjustments by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." *Arizona* v. *California,* 466 U. S. 144, 145.

The District Court litigation proceeded with the participation of eight parties: the United States, the States of Arizona and California, the Metropolitan Water District of Southern California, the Coachella Valley Water District, and the Quechan, Fort Mojave, and Colorado River Indian Tribes. The District Court rejected the United States' sovereign immunity defense; taking up the Fort Mojave Reservation matter first, the court voided the Secretary's determination of that reservation's boundaries. *Metropolitan Water Dist. of S. Cal.* v. *United States,* 628 F. Supp. 1018 (SD Cal. 1986). The Court of Appeals for the Ninth Circuit, however, accepted the United States' plea of sovereign immunity, and on that ground reversed and remanded with instructions to dismiss the entire case. Specifically, the Court of Appeals held that the Quiet Title Act, 28 U. S. C. §2409a, preserved the United States' sovereign immunity from suits challenging the United States' title "to trust or restricted Indian lands," §2409a(a), and therefore blocked recourse to the Dis-

trict Court by the States and state agencies. *Metropolitan Water Dist. of S. Cal.* v. *United States,* 830 F. 2d 139 (1987). We granted certiorari and affirmed the Ninth Circuit's judgment by an equally divided Court. *California* v. *United States,* 490 U. S. 920 (1989) *(per curiam).*

The dismissal of the District Court action dispelled any expectation that a "final determination" of reservation boundaries would occur in that forum. The State parties then moved to reopen the 1964 decree, asking the Court to determine whether the Fort Yuma Indian Reservation and two other reservations were entitled to claim additional boundary lands and, if so, additional water rights. Neither the United States nor the Tribes objected to the reopening of the decree, and the Court granted the motion. *Arizona* v. *California,* 493 U. S. 886 (1989). After the death in 1990 of the third Special Master, Robert McKay, the Court appointed Frank J. McGarr as Special Master. Special Master McGarr has now filed a report and recommendation (McGarr Report), a full understanding of which requires a discussion of issues and events specific to the Fort Yuma Indian Reservation. We now turn to those issues and events.

## II

The specific dispute before us has its roots in an 1884 Executive Order signed by President Chester A. Arthur, designating approximately 72 square miles of land along the Colorado River in California as the Fort Yuma Indian Reservation (Reservation) for the benefit of the Quechan Tribe. The Tribe, which had traditionally engaged in farming, offered to cede its rights to a portion of the Reservation to the United States in exchange for allotments of irrigated land to individual Indians. In 1893, the Secretary of the Interior concluded an agreement with the Tribe (1893 Agreement), which Congress ratified in 1894. The 1893 Agreement provided for the Tribe's cession of a 25,000-acre tract of boundary lands on the Reservation. Language in the agreement,

however, could be read to condition the cession on the performance by the United States of certain obligations, including construction within three years of an irrigation canal, allotment of irrigated land to individual Indians, sale of certain lands to raise revenues for canal construction, and opening of certain lands to the public domain.

Doubts about the validity and effect of the 1893 Agreement arose as early as 1935. In that year the construction of the All-American Canal, which prompted the interstate dispute in *Arizona I,* see 373 U. S., at 554–555, also sparked a controversy concerning the Fort Yuma Reservation. When the Department of the Interior's Bureau of Reclamation sought to route the canal through the Reservation, the Department's Indian Office argued that the Bureau had to pay compensation to the Tribe for the right-of-way. The Secretary of the Interior submitted the matter to the Department's Solicitor, Nathan Margold. In 1936, Solicitor Margold issued an opinion (Margold Opinion) stating that, under the 1893 Agreement, the Tribe had unconditionally ceded the lands in question to the United States. 1 Dept. of Interior, Opinions of the Solicitor Relating to Indian Affairs 596, 600 (No. M–28198, Jan. 8, 1936). The Margold Opinion remained the position of the Federal Government for 42 years.

In 1946, Congress enacted the Indian Claims Commission Act, 60 Stat. 1049, 25 U. S. C. § 70 *et seq.* (1976 ed.), establishing an Article I tribunal with power to decide claims of Indian tribes against the United States.[1] See generally

---

[1] The Act conferred exclusive jurisdiction on the Commission to resolve Indian claims solely by the payment of compensation. Section 2 of the Act gave the Commission jurisdiction over, among other things, claims alleging that agreements between a tribe and the United States were vitiated by fraud, duress, or unconscionable consideration, 25 U. S. C. § 70a(3) (1976 ed.), claims arising from the unlawful taking of Indian lands by the United States, § 70a(4), and claims based upon fair and honorable dealings not recognized by law or equity, § 70a(5). The Commission's "[f]inal determinations," § 70r, were subject to review by the Court of

*United States* v. *Dann*, 470 U. S. 39 (1985). The Tribe filed an action before the Commission in 1951, challenging the validity and effect of the 1893 Agreement. In that action, referred to by the parties as Docket No. 320, the Tribe relied principally on two mutually exclusive grounds for relief. First, the Tribe alleged that the 1893 Agreement was obtained through fraud, coercion, and/or inadequate consideration, rendering it "wholly nugatory." Petition for Loss of Reservation in Docket No. 320 (Ind. Cl. Comm'n), ¶¶ 15–16, reprinted in Brief for United States in Support of Exception, pp. 11a–27a. At the very least, contended the Tribe, the United States had failed to perform the obligations enumerated in the 1893 Agreement, rendering the cession void. *Id.*, at ¶ 31. In either event, the Tribe claimed continuing title to the disputed lands and sought damages essentially for trespass. Alternatively, the Tribe alleged that the 1893 Agreement was contractually valid but constituted an uncompensated taking of tribal lands, an appropriation of lands for unconscionable consideration, and/or a violation of standards of fair and honorable dealing, for which §§ 2(3)–(5) of the Act authorized recovery. *Id.*, at ¶¶ 19, 22, 25. According to this theory of recovery, the 1893 Agreement had indeed vested in the United States unconditional title to the dis-

Claims, § 70s(b), and, if upheld, were submitted to Congress for payment, § 70u. Section 15 authorized the Attorney General to represent the United States before the Commission and, "with the approval of the Commission, to compromise any claim presented to the Commission." 25 U. S. C. § 70n (1976 ed.). The Act provided that such compromises "shall be submitted by the Commission to the Congress as a part of its report as provided in section 70t of this title in the same manner as final determinations of the Commission, and shall be subject to the provisions of section 70u of this title." *Ibid.* Section 22(a) of the Act provided that "[t]he payment of any claim, after its determination in accordance with this chapter, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy." 25 U. S. C. § 70u(a) (1976 ed.). Pursuant to statute, § 70v, the Commission ceased its operations in 1978 and transferred its remaining cases to the Court of Claims.

puted lands, and the Tribe sought damages as compensation for that taking. During the more than quarter-century of litigation in Docket No. 320, the Tribe vacillated between these two grounds for relief, sometimes emphasizing one and sometimes the other. See *Quechan Tribe of Fort Yuma Reservation* v. *United States*, 26 Ind. Cl. Comm'n 15 (1971), reprinted in Brief for United States in Support of Exception, at 29a–34a.

The Commission conducted a trial on liability, but stayed further proceedings in 1970 because legislation had been proposed in Congress that would have restored the disputed lands to the Tribe. The legislation was not enacted, and the Commission vacated the stay. In 1976, the Commission transferred the matter to the Court of Claims.

In the meantime, the Tribe had asked the Department of the Interior to reconsider its 1936 Margold Opinion regarding the 1893 Agreement. In 1977, Interior Solicitor Scott Austin concluded, in accord with the 1936 opinion, that the 1893 Agreement was valid and that the cession of the disputed lands had been unconditional. Opinion of the Solicitor, No. M–36886 (Jan. 18, 1977), 84 I. D. 1 (1977) (Austin Opinion). It soon became clear both to the Tribe and to interested Members of Congress, however, that the Austin Opinion had provoked controversy within the Department, and, after the election of President Carter, the Department revisited the issue and reversed course. In 1978, without notice to the parties, Solicitor Leo Krulitz issued an opinion concluding that the 1893 Agreement had provided for a conditional cession of the disputed lands, that the conditions had not been met by the United States, and that "[t]itle to the subject property is held by the United States in trust for the Quechan Tribe." Opinion of the Solicitor, No. M–36908 (Jan. 2, 1979), 86 I. D. 3, 22 (1979) (Krulitz Opinion). On December 20, 1978, the Secretary of the Interior issued a Secretarial Order adopting the Krulitz Opinion and confirming the Tribe's entitlement to the disputed lands, with the ex-

press exception of certain lands that the United States had acquired pursuant to Act of Congress or had conveyed to third parties.

The 1978 Secretarial Order caused the United States to change its position both in Docket No. 320, which was still pending in the Claims Court, and in the present litigation. Because the Secretarial Order amounted to an admission that the 1893 Agreement had been ineffective to transfer title and that the Tribe enjoyed beneficial ownership of the disputed boundary lands, the United States no longer opposed the Tribe's claim for trespass in Docket No. 320. In the present litigation, the Secretarial Order both prompted the United States to file a water rights claim for the affected boundary lands and provided the basis for the Tribe's intervention to assert a similar, albeit larger, water rights claim. See *Arizona II*, 460 U. S., at 632–633. Those water rights claims are the subject of the current proceedings.

In August 1983, a few months after this Court decided in *Arizona II* that the 1978 Secretarial Order did not constitute a final determination of reservation boundaries, see *supra*, at 399–400, the United States and the Tribe entered into a settlement of Docket No. 320, which the Court of Claims approved and entered as its final judgment. Under the terms of that settlement, the United States agreed to pay the Tribe $15 million in full satisfaction of "all rights, claims, or demands which plaintiff [*i. e.*, the Tribe] has asserted or could have asserted with respect to the claims in Docket 320." Final Judgment, Docket No. 320 (Aug. 11, 1983). The judgment further provided that "plaintiff shall be barred thereby from asserting any further rights, claims, or demands against the defendant and any future action on the claims encompassed on Docket 320." *Ibid.* The United States and the Tribe also stipulated that the "final judgment is based on a compromise and settlement and shall not be construed as an admission by either party for the purposes of precedent or argument in any other case." *Ibid.* Both

the Tribe and the United States continue to recognize the Tribe's entitlement to the disputed boundary lands.

## III

Master McGarr has issued a series of orders culminating in the report and recommendation now before the Court. He has recommended that the Court reject the claims of the United States and the Tribe seeking additional water rights for the Fort Yuma Indian Reservation. The Master rejected the State parties' contention that this Court's *Arizona I* decision precludes the United States and the Tribe from seeking water rights for the disputed boundary lands. He concluded, however, that the United States and the Tribe are precluded from pursuing those claims by operation of the 1983 Claims Court consent judgment. The State parties have filed an exception to the first of these preclusion recommendations, and the United States and the Tribe have filed exceptions to the second. In Part III–A, *infra,* we consider the exception filed by the State parties, and in Part III–B we address the exceptions filed by the United States and the Tribe. The Special Master has also recommended that the Court approve the parties' proposed settlements respecting the Fort Mojave and Colorado River Indian Reservations. No party has filed an exception to those recommendations; we address them in Part III–C, *infra.*

## A

The States of Arizona and California, the Coachella Valley Water District, and the Metropolitan Water District of Southern California (State parties) argued before Special Master McGarr, and repeat before this Court, that the water rights claims associated with the disputed boundary lands of the Fort Yuma Reservation are precluded by the finality rationale this Court employed in dismissing the "omitted lands" claims in *Arizona II.* See *supra,* at 399–400. According to the State parties, the United States could have

raised a boundary lands claim for the Fort Yuma Reservation in the *Arizona I* proceedings based on facts known at that time, just as it did for the Fort Mojave and Colorado River Reservations, but deliberately decided not to do so, just as it did with respect to the "omitted lands." In *Arizona II*, this Court rejected the United States' claim for water rights for the "omitted lands," emphasizing that "[c]ertainty of rights is particularly important with respect to water rights in the Western United States" and noting "the strong interest in finality in this case." 460 U. S., at 620. Observing that the 1964 decree determined "the extent of irrigable acreage within the uncontested boundaries of the reservations," *id.*, at 621, n. 12, the Court refused to reconsider issues "fully and fairly litigated 20 years ago," *id.*, at 621. The Court concomitantly held that the Tribes were bound by the United States' representation of them in *Arizona I.* 460 U. S., at 626–627.

The Special Master rejected the State parties' preclusion argument. He brought out first the evident reason why the United States did not assert water rights claims for the Fort Yuma Reservation boundary lands in *Arizona I.* At that point in time, the United States was bound to follow the 1936 Margold Opinion, see *supra*, at 402, which maintained that the Tribe had no claim to those lands. "[I]t is clear," the Master stated, "that the later Secretary of the Interior opinion arbitrarily changing [the Margold] decision was a circumstance not known in 1964, thus constituting an exception to the application of the rule of *res adjudicata*." Special Master McGarr Memorandum Opinion and Order No. 4, pp. 6–7 (Sept. 6, 1991). Characterizing the question as "close," the Master went on to conclude that "the Tribe is not precluded from asserting water rights based on boundary land claims on *[sic]* this proceeding, because although the U. S. on behalf of the Tribe failed to assert such claims in the proceeding leading to the 1964 decree, a later and then unknown circum-

stance bars the application of the doctrine of *res judicata* to this issue." *Id.,* at 7.

While the Special Master correctly recognized the relevance of the Margold Opinion to the litigating stance of the United States, he ultimately relied on an improper ground in rejecting the State parties' preclusion argument. The Department of the Interior's 1978 Secretarial Order recognizing the Tribe's beneficial ownership of the boundary lands, see *supra,* at 404–405, does not qualify as a "later and then unknown circumstance" that can overcome otherwise applicable preclusion principles. The 1978 Order did not change the underlying facts in dispute; it simply embodied one party's changed view of the import of unchanged facts. Moreover, the Tribe can hardly claim to have been surprised by the Government's shift in assessment of the boundary lands ownership question, for the Tribe had been advocating just such a shift for decades.

The United States and the Tribe, however, urge other grounds on which to reject the State parties' argument regarding the preclusive effect of *Arizona I.* The United States and the Tribe maintain that the preclusion rationale the Court applied to the "omitted lands" in *Arizona II* is not equally applicable to the disputed boundary lands,[2] and that, in any event, the State parties have forfeited their preclusion defense. We agree that the State parties' preclusion de-

---

[2] The United States and the Tribe point to the holding in *Arizona I* that Special Master Rifkind had erred in prematurely considering boundary lands claims relating to the Fort Mojave and Colorado River Reservations, see 373 U. S., at 601; they contend that consideration of the Fort Yuma Reservation boundaries would have been equally premature. They further stress that in *Arizona II* we held the omitted lands claims precluded because we resisted "reopen[ing] an adjudication . . . to reconsider whether initial factual determinations were correctly made," 460 U. S., at 623–624; in contrast, they maintain, the present claims turn on the validity of the 1893 Agreement and the 1978 Secretarial Order, questions of law not addressed in prior proceedings.

fense is inadmissible at this late date, and therefore we do not reach the merits of that plea. The State parties could have raised the defense in 1979 in response to the United States' motion for a supplemental decree granting additional water rights for the Fort Yuma Reservation. The State parties did not do so then, nor did they raise the objection in 1982 when *Arizona II* was briefed and argued.[3] Unaccountably, they raised the preclusion argument for the first time in 1989, when they initiated the current round of proceedings. See Exception and Brief for State Parties 16; Motion of State Parties to Reopen Decree in *Arizona* v. *California*, O. T. 1989, No. 8 Orig., p. 6, n. 2. The State parties had every opportunity, and every incentive, to press their current preclusion argument at earlier stages in the litigation, yet failed to do so.[4]

---

[3] Noting that in *Arizona II* we "encouraged the parties to assert their legal claims and defenses in another forum," THE CHIEF JUSTICE concludes that the Court probably would have declined to resolve the preclusion issue at that stage of the case even had the State parties raised it then. *Post*, at 423 (opinion concurring in part and dissenting in part). One can only wonder why this should be so. If this Court had held in *Arizona II* that the United States and the Tribe were precluded from litigating their boundary lands claims, it would have been pointless for the Court to encourage pursuit of those claims "in another forum"; further assertion of the claims in any forum would have been barred. In any event, a party generally forfeits an affirmative defense by failing to raise it even if the relevant proceeding is ultimately resolved on other grounds.

[4] The dissent's observation that "the only 'pleadings' in this case were filed in the 1950's," *post*, at 422, is beside the point. The State parties could have properly raised the preclusion defense as early as February 1979, in their response to the United States' motion for modification of the decree, yet did not do so. See Response of the States of Arizona, California, and Nevada and the Other California Defendants to the Motion of the United States for Modification of Decree, O. T. 1978, No. 8 Orig. Alternatively, it was open to the State parties to seek leave to file a supplemental pleading "setting forth . . . occurrences or events which have happened since the date of the pleading sought to be amended." Fed. Rule Civ. Proc. 15(d). In such a supplemental pleading, and in compliance with Rule

"[W]hile the technical rules of preclusion are not strictly applicable [in the context of a single ongoing original action], the principles upon which these rules are founded should inform our decision." *Arizona II*, 460 U. S., at 619. Those principles rank res judicata an affirmative defense ordinarily lost if not timely raised. See Fed. Rule Civ. Proc. 8(c). Counsel for the State parties conceded at oral argument that "no preclusion argument was made with respect to boundary lands" in the proceedings leading up to *Arizona II*, and that "after this Court's decision in *Arizona II* and after the Court's later decision in [*Nevada* v. *United States*, 463 U. S. 110 (1983)], the light finally dawned on the State parties that there was a valid preclusion—or *res judicata* argument here with respect to Fort Yuma." Tr. of Oral Arg. 46–47. We disapprove the notion that a party may wake up because a "light finally dawned," years after the first opportunity to raise a defense, and effectively raise it so long as the party was (though no fault of anyone else) in the dark until its late awakening.

The State parties assert that our prior pronouncements in this case have expressly recognized the possibility that future boundary lands claims for the Fort Yuma Reservation might be precluded. If anything, the contrary is true. Nothing in the *Arizona II* decision hints that the Court believed the boundary lands issue might ultimately be held precluded. Rather, the Court expressly found it *"necessary* to decide whether any or all of these boundary disputes have been 'finally determined' within the meaning of Article

_____

8(c), the preclusion defense could have been raised. No such supplemental pleading was ever presented, and by 1989 a reasonable time to do so had surely expired.

The State parties' tardiness in raising their preclusion defense is hard to account for, while the United States' decision not to assert claims for the disputed boundary lands until 1978 can at least be explained by the continued vitality of the Margold Opinion, see *supra*, at 402. It is puzzling that the dissent should go to such lengths to excuse the former delay while relentlessly condemning the latter.

II(D)(5) . . . ." 460 U. S., at 631 (emphasis added). That *Arizona II* contains no discussion of preclusion with respect to the disputed lands is hardly surprising, given that the State parties neglected to raise that issue until six years later.

The Court did note in *Arizona II* that in the District Court proceedings the United States had asserted defenses based on "lack of standing, the absence of indispensable parties, sovereign immunity, and the applicable statute of limitations," and added that "[t]here will be time enough, if any of *these grounds for dismissal* are sustained and not overturned on appellate review, to determine whether the boundary issues foreclosed by such [lower court] action are *nevertheless* open for litigation in this Court." 460 U. S., at 638 (emphasis added). This passage, however, is most sensibly read to convey that the defenses just mentioned—standing, indispensable parties, sovereign immunity, and the statute of limitations—would not necessarily affect renewed litigation in this Court. The passage contains no acknowledgment, express or implied, of a lurking preclusion issue stemming from our *Arizona I* disposition.

Moreover, and of large significance, the 1979 and 1984 supplemental decrees anticipated that the disputed boundary issues for all five reservations, including the Fort Yuma Reservation, would be "finally determined" in some forum, not by preclusion but on the merits. See 1984 Supplemental Decree, Art. II(D)(5), *Arizona* v. *California,* 466 U. S., at 145 (Water rights for all five reservations "shall be subject to appropriate adjustments by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined."); 1979 Supplemental Decree, Art. II(D)(5), *Arizona* v. *California,* 439 U. S., at 421 (same).

The State parties themselves stipulated to the terms of the supplemental decree we entered in 1979. They also appear to have litigated the *Arizona II* proceedings on the un-

derstanding that the boundary disputes should be resolved on the merits. See 460 U. S., at 634 ("[The State parties] argued . . . that the boundary controversies were ripe for judicial review, and they urged the Special Master to receive evidence, hear legal arguments, and resolve each of the boundary disputes, but only for the limited purpose of establishing additional Indian water rights, if any."); Report of Special Master Tuttle, O. T. 1981, No. 8 Orig., p. 57 (describing the State parties' contention "that the boundaries [of all five reservations] have not been finally determined and that I should make a de novo determination of the boundaries for recommendation to the Court"). As late as 1988, the State parties asked the Court to appoint a new Special Master and direct him "to conclude his review of the boundary issues as expeditiously as possible and to submit a recommended decision to the Court." Brief for Petitioners in *California* v. *United States*, O. T. 1987, No. 87–1165, p. 49.

Finally, the State parties argue that even if they earlier failed to raise the preclusion defense, this Court should raise it now *sua sponte.* Judicial initiative of this sort might be appropriate in special circumstances. Most notably, "if a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte,* even though the defense has not been raised. This result is fully consistent with the policies underlying res judicata: it is not based solely on the defendant's interest in avoiding the burdens of twice defending a suit, but is also based on the avoidance of unnecessary judicial waste." *United States* v. *Sioux Nation*, 448 U. S. 371, 432 (1980) (REHNQUIST, J., dissenting) (citations omitted). That special circumstance is not present here: While the State parties contend that the Fort Yuma boundary dispute could have been decided in *Arizona I,* this Court plainly has not "previously decided the issue presented." Therefore we do not face the prospect of redoing a matter once decided. Where no judicial resources have been spent on the resolution of a question, trial courts must

be cautious about raising a preclusion bar *sua sponte,* thereby eroding the principle of party presentation so basic to our system of adjudication.

In view of the State parties' failure to raise the preclusion argument earlier in the litigation, despite ample opportunity and cause to do so, we hold that the claims of the United States and the Tribe to increased water rights for the disputed boundary lands of the Fort Yuma Reservation are not foreclosed by our decision in *Arizona I.*

## B

The State parties also assert that the instant water rights claims are precluded by the 1983 consent judgment in the Claims Court proceeding, Docket No. 320. Special Master McGarr agreed, noting the consent judgment's declaration that the Tribe would "be barred thereby from asserting any further rights, claims or demands against the defendant and any future action encompassed on docket no. 320." See Special Master McGarr Memorandum Opinion and Order No. 4, at 9–10. On reconsideration, the Special Master provided a fuller account of his recommendation. The settlement, he concluded, had extinguished the Tribe's claim to title in the disputed boundary lands, vesting that title in the United States against all the world: "The only viable basis for a damage or trespass claim [in Docket No. 320] was that the 1893 taking was illegal and that title therefore remained with the Tribe. When the Tribe accepted money in settlement of this claim, it relinquished its claim to title." *Id.,* No. 7, at 5 (May 5, 1992). See also *id.,* No. 13, at 3 (Apr. 13, 1993) ("[T]he relinquishment of all future claims regarding the subject matter of Docket No. 320 in exchange for a sum of money extinguished the Tribe's title in the subject lands . . . ."). Because the settlement extinguished the Tribe's title to the disputed boundary lands, the Master reasoned, the United States and the Tribe cannot now seek addi-

tional water rights based on the Tribe's purported beneficial ownership of those lands.

Under standard preclusion doctrine, the Master's recommendation cannot be sustained. As already noted, the express terms of the consent judgment in Docket No. 320 barred the Tribe and the United States from asserting against each other any claim or defense they raised or could have raised in that action. See *supra*, at 405. As between the parties to Docket No. 320, then, the settlement indeed had, and was intended to have, *claim-preclusive* effect—a matter the United States and the Tribe readily concede. Exception and Brief for United States 36; Exception and Brief for Quechan Indian Tribe 20. But settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect. "In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further litigation on any of the issues presented. Thus consent judgments ordinarily support claim preclusion but not issue preclusion." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4443, pp. 384–385 (1981). This differentiation is grounded in basic res judicata doctrine. It is the general rule that issue preclusion attaches only "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment." Restatement (Second) of Judgments § 27, p. 250 (1982). "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section [describing issue preclusion's domain] does not apply with respect to any issue in a subsequent action." *Id.*, comment *e*, at 257.

This Court's decision in *United States* v. *International Building Co.*, 345 U. S. 502 (1953), is illustrative. In 1942, the Commissioner of Internal Revenue assessed deficiencies

against a taxpayer for the taxable years 1933, 1938, and 1939, alleging that the taxpayer had claimed an excessive basis for depreciation. *Id.*, at 503. After the taxpayer filed for bankruptcy, however, the Commissioner and the taxpayer filed stipulations in the pending Tax Court proceedings stating that there was no deficiency for the taxable years in question, and the Tax Court entered a formal decision to that effect. *Id.*, at 503–504. In 1948, the Commissioner assessed deficiencies for the years 1943, 1944, and 1945, and the taxpayer defended on the ground that the earlier Tax Court decision was preclusive on the issue of the correct basis for depreciation. We disagreed, holding that the Tax Court decision, entered pursuant to the parties' stipulations, did not accomplish an "estoppel by judgment," *i. e.*, it had no issue-preclusive effect:

> "We conclude that the decisions entered by the Tax Court for the years 1933, 1938, and 1939 were only a *pro forma* acceptance by the Tax Court of an agreement between the parties to settle their controversy for reasons undisclosed .... Perhaps, as the Court of Appeals inferred, the parties did agree on the basis for depreciation. Perhaps the settlement was made for a different reason, for some exigency arising out of the bankruptcy proceeding. As the case reaches us, we are unable to tell whether the agreement of the parties was based on the merits or on some collateral consideration. Certainly the judgments entered are *res judicata* of the tax claims for the years 1933, 1938, and 1939, whether or not the basis of the agreements on which they rest reached the merits .... Estoppel by judgment includes matters in a second proceeding which were actually presented and determined in an earlier suit. A judgment entered with the consent of the parties may involve a determination of questions of fact and law by the court. But unless a showing is made that that was the case, the judgment has no greater dignity, so far as collateral estoppel

is concerned, than any judgment entered only as a compromise of the parties." *Id.*, at 505–506 (citations omitted).

The State parties, perhaps recognizing the infirmity of their argument as a matter of standard preclusion doctrine, assert that common-law principles of issue preclusion do not apply in the special context of Indian land claims. Instead, they argue, §22 of the Indian Claims Commission Act created a special regime of "statutory preclusion."[5] According to the State parties, the payment of a Commission judgment for claims to aboriginal or trust lands automatically and universally extinguishes title to the Indian lands upon which the claim is based and creates a statutory bar to further assertion of claims against either the United States or third parties based on the extinguished title. The State parties point to several decisions of the Ninth Circuit in support of this contention. See Reply Brief for State Parties 17 (citing *United States* v. *Pend Oreille Pub. Util. Dist. No. 1,* 926 F. 2d 1502 (CA9 1991)); Reply Brief for State Parties 15 (citing *United States* v. *Dann,* 873 F. 2d 1189 (CA9 1989)); Reply Brief for State Parties 11 (citing *United States* v. *Gemmill,* 535 F. 2d 1145 (CA9 1976)).

We need not decide whether, in the distinctive context of the Indian Claims Commission Act, some consent judgments

---

[5] Section 22 provided:

"(a) When the report of the Commission determining any claimant to be entitled to recover has been filed with Congress, such report shall have the effect of a final judgment of the Court of Claims, and there is authorized to be appropriated such sums as are necessary to pay the final determination of the Commission.

"The payment of any claim, after its determination in accordance with this chapter, shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy.

"(b) A final determination against a claimant made and reported in accordance with this chapter shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy." 25 U. S. C. §70u (1976 ed.).

might bar a tribe from asserting title even in discrete litigation against third parties, for the 1983 settlement of Docket No. 320 plainly could not qualify as such a judgment. Not only was the issue of ownership of the disputed boundary lands not actually litigated and decided in Docket No. 320, but, most notably, the Tribe proceeded on alternative and mutually exclusive theories of recovery. Had the case proceeded to final judgment upon trial, the Tribe might have won damages for a taking, indicating that title was in the United States. Alternatively, however, the Tribe might have obtained damages for trespass, indicating that title remained in the Tribe. The consent judgment embraced all of the Tribe's claims. There was no election by the Tribe of one theory over the other, nor was any such election required to gain approval for the consent judgment. The Special Master's assumption that the settlement necessarily and universally relinquished the Tribe's claim to title was thus unwarranted. Certainly, if the $15 million payment constituted a discharge of the Tribe's trespass claim, it would make scant sense to say that the acceptance of the payment extinguished the Tribe's title. In contrast, the Ninth Circuit cases cited by the State parties (the correctness of which we do not address) all involved Indian Claims Commission Act petitions in which tribes claimed no continuing title, choosing instead to seek compensation from the United States for the taking of their lands. See, *e. g., Pend Oreille,* 926 F. 2d, at 1507–1508; *Dann,* 873 F. 2d, at 1192, 1194; *Gemmill,* 535 F. 2d, at 1149, and n. 6.

The United States invites us to look behind the consent judgment in Docket No. 320 at presettlement stipulations and memoranda purportedly demonstrating that the judgment was grounded on the parties' shared view, after the 1978 Secretarial Order, that the disputed lands belong to the Tribe. We need not accept the Government's invitation. On the matter of issue preclusion, it suffices to observe that the settlement was ambiguous as between mutually exclu-

sive theories of recovery. Like the Tax Court settlement in *International Building Co.*, then, the consent judgment in the Tribe's Claims Court action is too opaque to serve as a foundation for issue preclusion. Accordingly, we hold that the claims of the United States and the Tribe to increased water rights for the disputed boundary lands of the Fort Yuma Reservation are not precluded by the consent judgment in Docket No. 320.

## C

The Special Master has recommended that the Court approve the parties' proposed settlement of the dispute respecting the Fort Mojave Reservation. The claim to additional water for the Fort Mojave Reservation arises out of a dispute over the accuracy of a survey of the so-called Hay and Wood Reserve portion of the Reservation. See *Arizona II*, 460 U. S., at 631–632. The parties agreed to resolve the matter through an accord that (1) specifies the location of the disputed boundary; (2) preserves the claims of the parties regarding title to and jurisdiction over the bed of the last natural course of the Colorado River within the agreed-upon boundary; (3) awards the Tribe the lesser of an additional 3,022 acre-feet of water or enough water to supply the needs of 468 acres; (4) precludes the United States and the Tribe from claiming additional water rights from the Colorado River for lands within the Hay and Wood Reserve; and (5) disclaims any intent to affect any private claims to title to or jurisdiction over any lands. See McGarr Report 8–9 (July 28, 1999). We accept the Master's uncontested recommendation and approve the proposed settlement.

The Master has also recommended that the Court approve the parties' proposed settlement of the dispute respecting the Colorado River Indian Reservation. The claim to additional water for that reservation stems principally from a dispute over whether the reservation boundary is the ambulatory west bank of the Colorado River or a fixed line repre-

senting a past location of the River.  See *Arizona II*, 460
U. S., at 631.  The parties agreed to resolve the matter
through an accord that (1) awards the Tribes the lesser of an
additional 2,100 acre-feet of water or enough water to irri-
gate 315 acres; (2) precludes the United States or the Tribe
from seeking additional reserved water rights from the Colo-
rado River for lands in California; (3) embodies the parties'
intent not to adjudicate in these proceedings the correct loca-
tion of the disputed boundary; (4) preserves the competing
claims of the parties to title to or jurisdiction over the bed
of the Colorado River within the reservation; and (5) pro-
vides that the agreement will become effective only if the
Master and the Court approve the settlement.  See McGarr
Report 9–10.  The Master expressed concern that the settle-
ment does not resolve the location of the disputed boundary,
but recognized that it did achieve the ultimate aim of deter-
mining water rights associated with the disputed boundary
lands.  *Id.*, at 10–12, 13–14.  We again accept the Master's
recommendation and approve the proposed settlement.[6]

\*     \*     \*

For the foregoing reasons, we remand the outstanding
water rights claims associated with the disputed boundary

---

[6] A group called the West Bank Homeowners Association has filed a
brief *amicus curiae* objecting to the proposed settlement of water rights
claims respecting the Colorado River Indian Reservation.  The Associa-
tion represents some 650 families who lease property from the United
States within the current boundaries of the Reservation.  The Court and
the Special Master have each denied the Association's request to intervene
in these proceedings.  See *Arizona* v. *California*, 514 U. S. 1081 (1995);
Special Master McGarr Memorandum Opinion and Order No. 17 (Mar. 29,
1995).  The Master observed that the Association's members do "not own
land in the disputed area and [the Association] makes no claim to title or
water rights," *id.*, at 2, thus their interests will "not be impeded or
impaired by the outcome of this litigation," *id.*, at 6.  Accordingly, we do
not further consider the Association's objections.

lands of the Fort Yuma Indian Reservation to the Special Master for determination on the merits. Those claims are the only ones that remain to be decided in *Arizona* v. *California;* their resolution will enable the Court to enter a final consolidated decree and bring this case to a close.

With respect to the Fort Mojave and Colorado River Reservations, the Special Master has submitted a proposed supplemental decree to carry the parties' accords into effect. That decree is reproduced as the Appendix to this opinion, *infra* this page and 421–422. The parties are directed to submit to the Clerk of this Court, before August 22, 2000, any objections to the proposed supplemental decree.

*It is so ordered.*

APPENDIX TO OPINION OF THE COURT

Proposed Supplemental Decree

It is ORDERED, ADJUDGED, AND DECREED:

A. Paragraph (4) of Article II(D) of the Decree in this case entered on March 9, 1964 (376 U. S. 340, 344–345) is hereby amended to read as follows:

> (4) The Colorado River Indian Reservation in annual quantities not to exceed (i) 719,248 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 107,903 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with priority dates of March 3, 1865, for lands reserved by the Act of March 3, 1865 (13 Stat. 541, 559); November 22, 1873, for lands reserved by the Executive Order of said date; November 16, 1874, for lands reserved by the Executive Order of said date, except as later modified; May 15, 1876, for lands reserved by the Executive Order of said date; November 22, 1915, for lands reserved by the Executive Order of said date.

B. Paragraph (5) of Article II(D) of the Decree in this case entered on March 9, 1964 (376 U. S. 340, 345) and supplemented on April 16, 1984 (466 U. S. 144, 145) is hereby amended to read as follows:

> (5) The Fort Mojave Indian Reservation in annual quantities not to exceed (i) 132,789 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 20,544 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less, with priority dates of September 19, 1890, for lands transferred by the Executive Order of said date; February 2, 1911, for lands reserved by the Executive Order of said date.

C. Paragraph (5) of the introductory conditions to the Supplemental Decree in this case entered on January 9, 1979 (439 U. S. 419, 421–423) is hereby amended by adding the following exception at the end of the concluding proviso in the first sentence of that paragraph: "except for the western boundaries of the Fort Mojave and Colorado River Indian Reservations in California."

D. Paragraph II(A)(24) of the Decree of January 9, 1979 (439 U. S. 419, 428) is hereby amended to read as follows:

24)

| | | | |
|---|---|---|---|
| Colorado River Indian Reservation | 10,745 | 1,612 | Nov. 22, 1873 |
| | 40,241 | 6,037 | Nov. 16, 1874 |
| | 5,860 | 879 | May 15, 1876 |

E. Paragraph II(A)(25) of the Decree of January 9, 1979 (439 U. S. 419, 428) is hereby amended to read as follows:

25)

| | | | |
|---|---|---|---|
| Fort Mojave Indian Reservation | 16,720 | 2,587 | Sept. 18, 1890 |

F. Except as otherwise provided herein, the Decree entered on March 9, 1964, and the Supplemental Decrees entered on January 9, 1979, and April 16, 1984, shall remain in full force and effect.

G. The Court shall retain jurisdiction herein to order such further proceedings and enter such supplemental decree as may be deemed appropriate.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, concurring in part and dissenting in part.

I believe that the United States' and the Quechan Tribe's claim for additional water rights is barred by the principles of res judicata, and therefore I dissent. The Special Master concluded that an exception to the general preclusion rule applied and that, therefore, the United States' claim was not barred. The Court rejects the Special Master's reasoning but concludes that the State parties' res judicata defense is not properly before the Court. While I agree that the Special Master erred in finding the 1978 order of the Secretary of the Interior a "new fact" justifying an exception to the application of preclusion, I disagree with the Court's refusal to reach the merits of the State parties' defense.

The Court first concludes that the State parties lost the defense because they failed to assert it in a timely manner. While the State parties concede that they did not raise their claim of res judicata until 1989, it does not automatically follow that the defense is lost. Federal Rule of Civil Procedure 8(c) provides that res judicata shall be pleaded as an affirmative defense. But the only "pleadings" in this case were filed in the 1950's, at which time no claim of res judicata could have been made. The motions filed by the State parties in 1977 and 1979 were not in any sense comprehensive pleadings, purporting to set forth all of the claims and defenses of the parties. More importantly, neither Special Master Tuttle nor this Court focused on the merits of the boundary dispute during the proceedings in *Arizona* v. *California,* 460 U. S. 605 (1983) *(Arizona II).* Rather, the Master only decided whether the Secretary's order was a final boundary determination, and, similarly, this Court simply de-

termined that the Secretary's order was subject to challenge and encouraged the parties to assert their legal claims and defenses in another forum. Consequently, it is likely that the State parties' res judicata claim would not have been resolved in *Arizona II* even if it had been raised.

The State parties did expressly raise the defense of res judicata in their 1989 motion, and neither the United States nor the Tribe objected to its consideration. The Tribe contested the merits of the State parties' res judicata claim and argued that its water rights' claim was not precluded. In so doing, the Tribe asserted that the State parties had not argued res judicata during the *Arizona II* proceedings. But neither the Tribe nor the United States contended, in response to the State parties' motion, that the Court could not decide the res judicata issue because it was not timely raised. We granted the motion, and Special Master McGarr considered the claim on the merits. Under these circumstances, I believe that the State parties did not lose their res judicata defense by failing to assert it in the earlier proceedings.

The Court also concludes that this Court's 1979 and 1984 supplemental decrees "anticipated" that the boundary dispute would be finally resolved in some forum. See *ante,* at 411. To reach this conclusion, the Court reads too much into the simple language of the supplemental decrees and ignores language in our *Arizona II* opinion. The supplemental decrees stated that water rights for the five reservations "shall be subject to appropriate adjustments by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." 1984 Supplemental Decree, Art. II(D)(5), *Arizona* v. *California,* 466 U. S. 144, 145 (1984); 1979 Supplemental Decree, Art. II(D)(5), *Arizona* v. *California,* 439 U. S. 419, 421 (1979) *(per curiam).* These decrees can best be interpreted as merely providing that the reservation's water quantity can be adjusted *if* the boundary changes, without deciding whether

the boundary relied on in the 1964 decree could be properly challenged, and without indicating that the boundary necessarily would be "finally determined" at some future point. This reading is supported by language in *Arizona II*. In discussing the pending District Court action, we explained: "We note that the United States has moved to dismiss the action filed by the agencies based on lack of standing, the absence of indispensable parties, sovereign immunity, and the applicable statute of limitations. *There will be time enough, if any of these grounds for dismissal are sustained and not overturned on appellate review, to determine whether the boundary issues foreclosed by such action are nevertheless open for litigation in this Court.*" 460 U. S., at 638 (emphasis added; footnote omitted). As is evident from this language, we did not "anticipate" that the dispute would be finally resolved. Instead, we explicitly left open the question whether the dispute could be litigated in this Court.

The Court disregards this language in *Arizona II* because it does not mention a potential preclusion defense. However, the point is not that this Court anticipated the State parties' preclusion defense. Rather, it is that this Court recognized the possibility that the boundary issue would not be judicially resolved at all, and left open the question whether there was some defense precluding this Court's review. What that defense might be was not before the Court.

Now that the question is squarely before us, I would hold that the United States' claim for additional water rights is barred by the principles of res judicata. Res judicata not only bars relitigation of claims previously litigated, but also precludes claims that could have been brought in earlier proceedings. Under the doctrine of res judicata, "when a final judgment has been entered on the merits of a case, '[i]t is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat

the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Nevada v. United States*, 463 U. S. 110, 129–130 (1983) (quoting *Cromwell v. County of Sac*, 94 U. S. 351, 352 (1877)).

In *Arizona II*, we recognized that the general principles of res judicata apply to our 1964 decree even though the decree expressly provided for modification in appropriate circumstances. In so doing, we noted the importance of the certainty of water rights in the Western United States. "A major purpose of this litigation, from its inception to the present day, has been to provide the necessary assurance to States of the Southwest and to various private interests, of the amount of water they can anticipate to receive from the Colorado River system. . . . If there is no surplus of water in the Colorado River, an increase in federal reserved water rights will require a 'gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators.'" 460 U. S., at 620–621 (quoting *United States v. New Mexico*, 438 U. S. 696, 699 (1978)). Thus, we concluded that allowing recalculation of the amount of practicably irrigable acreage "runs directly counter to the strong interest in finality in this case." 460 U. S., at 620. We also noted that treating the 1964 calculation as final comported with the clearly expressed intention of the parties and was consistent with our previous treatment of original actions, allowing modifications after a change in the relevant circumstances.

This reasoning is equally applicable to the United States' and the Tribe's claim for additional water for the disputed boundary lands. Even though the exact claim was not actually litigated in *Arizona v. California*, 373 U. S. 546 (1963) *(Arizona I)*, the United States could have raised the boundary claim and failed to do so. Indeed, in the proceedings before Special Master Rifkind, the counsel for the United States affirmatively represented that "[t]he testimony . . . as reflected by these maps and by the other testimony will de-

fine the maximum claim which the United States is asserting in this case." Earlier in the proceedings, the Master explicitly warned the United States about the preclusive effect of failing to assert potential claims: "In an action or a decree quieting title, you cut out all claims not asserted. . . . I just want you to be aware of the fact that the mere fact that it has not been asserted does not mean that you may not lose it . . . ." Exception by State Parties to Report of Special Master and Supporting Brief 8–9 (colloquy between counsel for the United States and the Special Master). Thus, under the general principles of res judicata, the United States would clearly be barred from now asserting the claim for additional water rights.

Special Master McGarr concluded that the United States' claim was not precluded because it fell within an exception to the bar of res judicata. Wisely abandoning the Master's reasoning, the United States instead defends the Master's ruling on the ground that these claims "are not precluded, under basic principles of res judicata, because [they] were not decided, and could not have been decided, in the prior proceedings." Reply Brief for United States in Response to Exception of State Parties 21. But this argument fares no better.

The issue before the Master in *Arizona I* was the amount of water from the Colorado River to which the Quechan Tribe was entitled. The Master made an allotment to the reservation based on the evidence then before him as to the amount of irrigable acreage within the reservation boundary, which was undisputed at the time. Only years after that decree was confirmed by this Court in *Arizona I* did the United States assert a larger claim to water for the reservation based on a claim for a larger amount of irrigable acreage—not because of a miscalculation as to the irrigability of acreage already claimed, but because of a claimed extension of the boundaries of the reservation. But, at the time of *Arizona I*, the United States had in its possession all of

the facts that it later asserted in 1979 in *Arizona II*, and it could have litigated the larger claim before Special Master Rifkind.

The United States offers no support for its contention that the boundary dispute could not have been decided in *Arizona I* except for the fact that this Court rejected the Master's resolution of the Fort Mojave Reservation and Colorado River Reservation boundary disputes. However, those boundary disputes are different. While we did not explain in *Arizona I* why we believed it was improper to decide the boundary disputes, California's objection was based on the fact that necessary parties were not participating in the proceedings. Specifically, California argued that it lacked the authority to represent private individuals claiming title to the disputed lands and maintained that "it would be unfair to prejudice any of the parties in future litigation over land titles or political jurisdiction by approving findings on a tangential issue never pleaded by the United States." *Arizona II, supra,* at 629. The Fort Yuma Reservation boundary dispute, on the other hand, is solely between the United States and the Quechan Tribe—there are no private parties claiming title to the land. Thus, the United States could have raised this claim in *Arizona I,* and the Master could have decided it.

Because I believe that the State parties' res judicata defense is properly before the Court and that the United States' claim for additional water rights is precluded, I see no need to remand for further proceedings. I agree with the Court that we should approve the proposed settlements of the remaining claims in this case and direct the parties to submit any objections to the proposed supplemental decree.