**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CELL THERAPEUTICS INC.,
    *Plaintiff-Appellant,*

   v.

LASH GROUP INC.; DOCUMEDICS
ACQUISITION CO., INC.,
    *Defendants-Appellees.*

No. 08-35619

D.C. No.
2:07-cv-00310-JLR

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
August 31, 2009—Seattle, Washington

Filed November 18, 2009
Amended January 6, 2010

Before: Michael Daly Hawkins, M. Margaret McKeown and
Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown

**COUNSEL**

Daniel J. Dunne and Paul F. Rugani, Orrick, Herrington & Sutcliffe LLP, Seattle, Washington, for the appellant.

Raymond A. Cardozo, Reed Smith LLP, San Francisco, California, and Laurie M. Thornton, Corr Cronin Michelson Baumgardner & Preece LLP, Seattle, Washington, for the appellee.

**ORDER**

The Opinion filed on November 18, 2009, is amended as follows: On slip Opinion page 15321, line 9, at the end of the paragraph, insert the following text: We make no judgment regarding the timeliness or the ultimate viability of what Lash characterizes as CTI's untimely supplemental disclosure regarding its $12.3 million in alleged business losses.

With this amendment, the panel has voted to deny the petition for panel rehearing and rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and rehearing en banc is DENIED. No further petitions shall be entertained.

---

## OPINION

McKEOWN, Circuit Judge:

The False Claims Act ("FCA") was designed to encourage reporting of false or fraudulent claims that are submitted to the federal government for approval or payment. Typically a relator—a whistle-blowing employee, a business partner or competitor—brings suit "for the benefit of the United States." *Mortgages, Inc. v. U.S. Dist. Ct.*, 934 F.2d 209, 210 (9th Cir. 1991) (per curiam). The government has discretion to intervene in the suit as a plaintiff. But what happens when a target defendant settles with the government and the relator and then seeks recovery against a third party for contractual indemnity and independent claims? We have not previously had occasion to address this question. We conclude that the FCA does not preclude such claims.

### I. BACKGROUND

#### A. THE FALSE CLAIMS ACT

A brief review of the Act's structure is useful in putting the third party claim issue in context. The purpose of the FCA is "to discourage fraud against the government." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). The FCA imposes civil liability on any person who knowingly uses a "false record or statement to get a false or fraudulent claim paid or approved by the Government," 31

U.S.C. § 3729(a)(2) (1984), and any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." *Id.* § 3729(a)(3).[1] To encourage the disclosure of potential fraud, under the qui tam provisions of the FCA, relators may "bring a civil action for a violation of [§] 3729 for the person and for the United States Government." *Id.* § 3730(b)(1); *United States ex rel. Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230, 233 (9th Cir. 1997). If the government does not intervene in the suit, the relator may proceed with the FCA litigation. 31 U.S.C. § 3730(c)(3). If the government elects to intervene, the relator remains part of the suit as a qui tam plaintiff, *id.* § 3730(b)(2), but the government may dismiss or settle the action over the relator's objection. *Id.* § 3730(c)(2)(A)-(B).

The FCA provides two important incentives for relators: a significant bounty and whistle-blower protection. A relator is entitled to 15-25% of the proceeds of the action or settlement of a claim in which the government intervenes, *id.* § 3730(d)(1), and as much as 25-30% if the government does not intervene. *Id.* § 3730(d)(2).

In crafting whistle-blower protections, Congress aimed "to make employees feel more secure in reporting fraud to the United States." *Neal v. Honeywell Inc.*, 33 F.3d 860, 863 (7th Cir. 1994), *abrogated on other grounds by Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 416-17 (2005). Employees who investigate and supply information concerning the fraudulent practices of an employer are protected from retaliation, whether the

---

[1]The statute was recently amended and now holds liable "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] conspires to commit a violation of" these subparagraphs. 31 U.S.C. § 3729(a)(1)(A)-(C) (effective May 20, 2009). CTI was charged under the prior language, but the differences are not material to our decision.

employee or the government brings suit against the employer. 31 U.S.C. § 3730(h); *Neal*, 33 F.3d at 863-65.

Nothing in the text or the legislative history of the FCA addresses the potential preclusive effect of a settlement among the government, a relator, and a qui tam defendant vis-a-vis a subsequent claim by the qui tam defendant against a third party. As one treatise notes, "[t]he legislative history of the 1986 amendments [to the False Claims Act] does not discuss the availability of indemnity or contribution, but does emphasize the strong public policy of encouraging whistle-blowers to come forward." 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 4.10[B] at 4-258.1 (3d ed. 2006). Congress did contemplate, however, that disputes would be resolved through settlement. *See, e.g.*, 31 U.S.C. § 3730(d)(1), (3) (specifying the proportion of the proceeds of an "action or settlement" a relator is entitled to receive). Congress also specifically contemplated the potential preclusive effects those final judgments rendered in *other* proceedings would have on qui tam actions. Section 3731(e) of the current version of the Act provides that

> a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730 [of the FCA].

31 U.S.C. § 3731(e).

### B. FACTUAL BACKGROUND[2]

[2]In reviewing the district court's grant of judgment on the pleadings, we accept as true all allegations in CTI's complaint and treat as false those allegations in the answer that contradict CTI's allegations. *MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006).

Cell Therapeutics, Inc. ("CTI") developed a cancer drug called Trisonex, which the Food and Drug Administration ("FDA") approved in September 2000 for the treatment of a particularly virulent form of leukemia. This was the first time CTI, a small and relatively young biotechnology company, had received FDA approval, so it turned to Documedics Acquisition Co., Inc. ("Documedics") to handle Medicare reimbursement and serve as a reimbursement consultant.

Documedics billed itself as an expert in reimbursement protocol for oncology drugs, but made a serious error in advising CTI. In addition to the approved use for Trisonex, oncologists prescribed several "off-label" uses to treat other cancers—uses for which the FDA had not approved the drug—and Documedics mistakenly advised CTI, and in turn Medicare carriers and medical providers, that the off-label uses were reimbursable by Medicare. Because of these assurances, the carriers and providers submitted reimbursement claims to Medicare. Once CTI understood that Trisonex was already eligible for reimbursement for these off-label uses, CTI stopped pursuing further research and publications that would have supported Medicare reimbursement. CTI also alleges that it elected not to divest Trisonex and made other business decisions based on Documedics' ill-informed advice, which resulted in losses for CTI.

The government began investigating CTI and the Lash Group ("Lash"), Documedics' successor in interest, in the fall of 2004. Two years later, in 2006, James Marchese, a CTI employee, filed a qui tam action against CTI and Lash.

In 2007, the government intervened in the suit as to CTI but not as to Lash. Specifically, the government alleged CTI "knowingly and willfully promoted the sale and use of Trisonex . . . for such indications [as] had not been approved as safe and effective by the FDA" and "made false and misleading statements to treating doctors . . . causing them to present false or fraudulent claims to Medicare." In addition to the

FCA claims, the government alleged common law fraud, negligent misrepresentation and unjust enrichment.

CTI immediately settled with Marchese and the government for $10.6 million, and the government and Marchese stipulated to dismissal of their claims with prejudice. One day later, the district court dismissed the claims without making a finding of liability. Lash settled with Marchese for an undisclosed amount in 2008.

While the qui tam suit was pending, CTI sued Lash in state court for: (1) declaratory relief that Lash was contractually obligated to indemnify CTI for damages related to the government's investigation and any resulting judgment or settlement, (2) breach of the service agreement, (3) breach of a contractual indemnification clause, (4) breach of the implied warranty of good faith and fair dealing, and (5) negligence / breach of the duty of care in providing professional services. The action was removed to federal court and is the basis of the claims now on appeal.

The district court granted Lash's motion for judgment on the pleadings on the ground that CTI's claims are barred by our holding in *Mortgages*, in which we directed dismissal of a qui tam defendant's counterclaims for indemnification against the relator. 934 F.2d at 210.

The district court concluded that qui tam defendants may not seek indemnification or contribution from co-participants in a scheme to defraud the government, and as a result found that CTI's claims against Lash were barred because its damages were pleaded as "incidental to and dependent upon its payments . . . to settle the FCA claims in the underlying qui tam action."

## II. ANALYSIS

### A. CLAIMS BY QUI TAM DEFENDANTS IN THE NINTH CIRCUIT

The bounty and whistle-blower provisions of the FCA work together to not only encourage relators to come forward but also to protect them when they do. Our case law has also fashioned a remedy designed to protect qui tam relators from retaliation by defendants.

We first addressed counterclaims by qui tam defendants in *Mortgages*. Mortgages, Inc., a mortgage lending company, accepted allegedly fraudulent loan applications filled out by defendants who applied for low-income loans, transferred the property secured with the loans to co-defendants, and then defaulted on the loans. The Department of Housing and Urban Development lost millions of dollars, and Mortgages ultimately settled with the government for nearly half a million dollars. 934 F.2d at 210.

Mortgages later brought a qui tam suit against the defendants, offering the government information it acquired about the defendants' false loan applications. The defendants, alleging that Mortgages defrauded and misled them as to the nature of the investment scheme, brought counterclaims for breach of the covenant of good faith and fair dealing, breach of fiduciary duty, fraud, negligence, negligent misrepresentation, and conspiracy. *Id.* at 210-11.

Mortgages moved to dismiss the counterclaims, taking the position that qui tam defendants could not file counterclaims against qui tam plaintiffs. Mortgages referenced a Senate Report stating that a qui tam relator "is afforded protection from retaliation for his actions." S. Rep. No. 99-345, at 13 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5278 (hereinafter Senate Report). The district court denied Mortgages' motion to dismiss the counterclaims, finding the Senate

Report more likely referred to the whistle-blower protection codified at 31 U.S.C. § 3730(h) that same year.

Upon considering a writ of mandamus filed by Mortgages, we instructed the district court to vacate its order that Mortgages respond to the counterclaims. *Mortgages*, 934 F.2d at 212, 214. Reasoning that "[t]he FCA is in no way intended to ameliorate the liability of wrongdoers by providing defendants with a remedy against a qui tam plaintiff with 'unclean hands,' " *id.* at 213, we concluded that there was "no right of indemnity or contribution among participants in a scheme to defraud the government in violation of the FCA." *Id.* at 212. In the same vein, we also concluded that there can be no right to assert state law counterclaims that would, in effect, provide contribution. *Id.* at 214.

**[1]** Three years later, we reconsidered the question of claims against a relator, holding that a qui tam defendant may bring independent claims against a relator. *United States ex rel. Madden v. Gen. Dynamics Corp.*, 4 F.3d 827, 831 (9th Cir. 1993). In *Madden*, former and current employees of General Dynamics brought a qui tam action claiming the company defrauded the Navy. The government chose not to intervene, and General Dynamics brought multiple state law counterclaims, ranging from breach of the duty of loyalty and violations of the California Labor Code to misappropriation of trade secrets. *Id.* at 829.

The district court dismissed General Dynamics' counterclaims for damages on the ground that the practical effect of those claims was to provide a defendant the opportunity to offset its liability by recovering from qui tam plaintiffs. Although these claims were "substantively similar to those raised in *Mortgages*," we reversed the district court and held that rather than seeking indemnification and/or contribution, General Dynamics sought "independent damages." *Id.* at 830. Claims for independent damages are distinguishable from

claims for indemnification or contribution, which, by definition, "*only* have the effect of offsetting liability." *Id.* at 831.

In *Madden*, we further resolved that even dependent counterclaims should not be foreclosed until the qui tam defendant's liability is established, reasoning that denying a qui tam defendant recourse to damages offends procedural due process. *Id.* at 831. To avoid a potential conflict with *Mortgages*, we suggested adopting a two-stage resolution process for resolving liability in FCA actions before adjudicating a counterclaim:

> If a qui tam defendant is found liable, the counterclaims can then be dismissed on the ground that they will have the effect of providing for indemnification or contribution. On the other hand, if a qui tam defendant is found not liable, the counterclaims can be addressed on the merits.

*Id.* (citing *Burch ex rel. United States v. Piqua Eng'g, Inc.*, 145 F.R.D. 452, 457-58 (S.D. Ohio 1992)).[3]

Both *Mortgages* and *Madden* figured prominently in the district court's dismissal of CTI's claims against Lash. The district court concluded that *Madden* is inapposite and that CTI should not be allow to "wriggle out of *Mortgages* and into *Madden*." We think that it is not *Mortgages* that limits *Madden*, but *Madden* that circumscribes *Mortgages*.

**[2]** *Madden* directly addresses two key questions that underlie our analysis in this case: First, are any of CTI's claims appropriately considered "independent claims"? Second, has there been a finding of liability that would preclude dependent claims that might in effect give CTI an indemnity?

---

[3]The district court in *Burch* bifurcated the qui tam plaintiffs' FCA litigation from the defendant's independent employment-related claims. *Burch*, 145 F.R.D. at 458.

That the qui tam claims here were resolved by settlement rather than a finding of liability adds a wrinkle not considered in *Madden*. We examine these issues in light of *Mortgages* and *Madden* and conclude the district court's grant of Lash's motion for judgment on the pleadings, which we review de novo,[4] must be reversed.

### B.  INDEPENDENT CLAIMS

**[3]** Under *Madden*, CTI may advance independent claims without regard to an eventual finding of liability under the FCA. 4 F.3d at 831. It is incumbent on the district court to separate those claims for damages which "*only* have the effect of offsetting liability" from those that are not dependent on a qui tam defendant's liability under the FCA. *Id.*

**[4]** CTI alleges that Lash's bad advice resulted in $12.3 million in damages in addition to the $10.5 million CTI paid to settle the government's claims. The district court parsed CTI's complaint as articulating claims related only to the settlement of the qui tam action, instead of dependent and independent claims.

In its second cause of action for breach of contract, its fourth cause of action for breach of the implied warranty of good faith and fair dealing, and its fifth cause of action for negligence / breach of duty of care, CTI alleged that

> LASH GROUPS's breach was a direct and proximate cause of damage to CTI in the form of investigation, litigation and settlement expenses, including attorneys' fees and costs, in an amount to be proven at trial, lost opportunities to pursue other means of reimbursement, damage to reputation, and increased cost of capital.

---

[4]*Madden*, 4 F.3d at 830 ("[W]hether a qui tam defendant can bring counterclaims [is a] question of law which we review de novo.").

In dissecting this claim, the district court found that the word "including" modified not only "attorneys' fees and costs, in an amount to be proven at trial," but also the remainder of the paragraph. As a result, the district court concluded that the claim for $12.3 million in damages caused by Lash's unlawful actions and erroneous advice, which lead CTI to miss opportunities to alter its sales and marketing plans, seek FDA approval for Trisonex, or divest itself of Trisonex, was not an independent claim, but "rode on the back of the claims for FCA indemnification barred by *Mortgages*."

While CTI likely could have mitigated this erroneous construction through the judicious use of semi-colons or separate sentences, a failure to include the grammatical fix is not sufficient to transform an independent claim into a claim that "*only* [has] the effect of offsetting liability." The district court's construction is peculiar. Taken in light of the facts alleged in CTI's complaint, CTI has alleged four types of damage, "in the form of": (1) "investigation, litigation and settlement expenses, including attorneys' fees and costs, in an amount to be proven at trial"; (2) "lost opportunities to pursue other means of reimbursement"; (3) "damage to reputation"; and (4) "increased cost of capital." Although these claims may follow from the alleged bad advice, only the first is arguably a claim for indemnification for the costs incurred in settling the qui tam action.

The district court also mistakenly inverted the *Madden* standard, treating the *Marchese* Settlement Agreement as if it depended entirely on the question of fraud liability under the FCA because one of the government's claims was for fraud under the FCA. Instead, *Madden* defines claims that amount to indemnification or contribution as claims that "*only* have the effect of offsetting liability" in the qui tam action. *Id.* The government's claims against CTI included claims that were not, and indeed could not have been, brought as part of the original qui tam action. In addition to its fraud claims, the government alleged that CTI was unjustly enriched by the

Medicare payments, and that it negligently misrepresented Trisonex's status through its agents who "professed to have special knowledge regarding Medicare reimbursement." The FCA requires knowledge that the claims for payment were fraudulent, whereas the unjust enrichment and negligent misrepresentation claims do not. *See* 31 U.S.C. § 3729(a)(1)(A).

**[5]** The restrictions in *Mortgages* do not extend to damages for claims other than those for fraud under the FCA. The liability for which the *Mortgages* court barred indemnification was solely for fraud or conspiracy to commit fraud under the FCA. Here, had a jury reached a finding of liability for CTI as to unjust enrichment and negligent misrepresentation but not fraud, nothing in *Mortgages* would bar CTI's claims for indemnification against Lash. The facts articulated in CTI's complaint are sufficient to state a claim for damages independent of the question of CTI's liability under the FCA.

## C.   THE EFFECT OF SETTLEMENT ON QUI TAM LIABILITY

**[6]** In contrast to claims for independent damages, claims that merely indemnify CTI for its FCA liability or seek contribution for the same must be dismissed if CTI is liable under the FCA. *Madden*, 4 F.3d at 831. Two reasons lead us to conclude that the district court erred in characterizing the settlement as effectively establishing FCA liability and thus barring the claims against Lash. First, settlements generally do not bar claims against non-parties or have issue-preclusive effect (sometimes referred to as "collateral estoppel") on the subsequent litigation of issues not expressly resolved in the settlement. That principle is particularly true in this case, where the government signed on to a settlement that specifically disclaimed CTI's liability and Lash was not even a party to the settlement. Second, the district court's presumption that a settlement with the government is equivalent to a finding of liability would chill the settlement process, signaling to future qui tam defendants that the only way to preserve potentially

legitimate claims would be to secure a litigated judgment in court.

The district court treated CTI's settlement with the government as having preclusive effect on the question of CTI's liability under the FCA. Sidestepping the express disclaimer of liability in the Settlement Agreement, the district court relied instead on the fact that the Agreement did not include a "finding that CTI was *not* legally liable," and concluded that "the certainties [regarding CTI's liability] outweigh the uncertainties." The district court's reasoning inverts the traditional treatment of settlement agreements.

The Settlement Agreement included the following language regarding liability:

> This Agreement is neither intended by the parties to be, nor should be, interpreted as an admission of liability by CTI. In addition, the parties agree that no representation, term or condition of this Settlement Agreement or any draft thereof shall be admissible as an admission of, or evidence of, any fault or omission of CTI in any proceeding in any court or before any administrative body.

Regarding potential claims against non-parties, the Settlement Agreement specifies that it

> is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except . . . for billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

The Settlement Agreement also affirmatively precludes any attempt by CTI to avoid its obligations through bankruptcy

proceedings, or to use the agreement to bar an administrative remedy or criminal prosecution under the Double Jeopardy or Excessive Fines Clauses.

Thus, the government obtained several concessions from CTI regarding particular preclusive effects of the Settlement Agreement, but no concessions regarding CTI's liability for fraud. To the contrary, the Settlement Agreement specifically disclaims its potential preclusive effect regarding issues of liability and fault under the FCA.

[7] Lash was a party to the qui tam litigation before the government's decision to intervene as to CTI, and Lash later settled with Marchese for an undisclosed amount. The Settlement Agreement, however, releases only healthcare beneficiaries and parties connected with them from third-party claims. No other parties are released. By its terms, the Settlement Agreement should not be construed as a final judgment on CTI's FCA liability.

[8] The structure of the Settlement Agreement comports with the longstanding principle that settlement agreements generally preclude further litigation on the claims by and against parties to the initial settlement, but issue preclusion generally does not attach to a settlement agreement. Echoing this principle, in *Arizona v. California*, 530 U.S. 392 (2000), the Supreme Court held that settlements "ordinarily occasion no *issue preclusion* . . . unless it is clear . . . that the parties intend their agreement to have such an effect." *Id.* at 414.[5] "In most circumstances, it is recognized that consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are not intended to preclude further

---

[5]The Supreme Court further noted that a settlement and consent judgment, which specified that where the "final judgment is based on a compromise and settlement [it should] not be construed as an admission by either party for the purposes of precedent or argument in any other case," did not preclude certain subsequent claims. *Id.* at 405.

litigation on any of the issues presented." 18A Charles Allen Wright et al., *Federal Practice and Procedure*, § 4443 at 265 (2d. ed. 2002). Thus, issue preclusion does not settle CTI's liability.

**[9]** The final question is whether claim preclusion supports the district court's finding of liability. Claim preclusion, often referred to as res judicata, bars any subsequent suit on claims that were raised or could have been raised in a prior action. Claim preclusion "applies when there is (1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between the parties." *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002).

**[10]** The Settlement Agreement would properly preclude further litigation between CTI and the government, or between CTI and Marchese, regarding the qui tam action and the government's additional claims. Claim preclusion does not attach to CTI's claims against Lash, however. Lash was not a party to the Settlement Agreement, and none of CTI's claims against Lash were raised in the qui tam litigation, nor were they included in the settlement. Just as significantly, there has been no final judgment on the merits.

Not only did the parties to the qui tam suit not foreclose claims vis-a-vis Lash, but giving the consent judgment the imprimatur of a liability finding would upend the settlement process. In effect, the district court read between the lines to conclude that the certainties about CTI's liability "out-weigh[ed] the uncertainties." This invasion into the settlement milieu is unprecedented.

**[11]** In resolving disputes under the FCA, we have recognized "the general policy in favor of encouraging parties to settle disputes." *Hall*, 104 F.3d at 233. Treating a qui tam settlement as a de facto finding of liability would inevitably chill the settlement spirit. While it is particularly difficult to ascertain what percentage of qui tam actions are settled because

many settlements are not reported, commentators agree that the majority of qui tam actions are resolved through settlement.[6] Expanding the effect of a settlement to bar independent claims against third parties or claims for indemnification or contribution apart from FCA liability would inevitably tip the equation toward trial rather than settlement, even where settlement would ordinarily be in the best interest of the parties. The bottom line is that a settlement agreement under the FCA should not, absent specific and clearly identified intent to the contrary, be viewed as an admission of liability that precludes non-FCA claims against third parties.

## CONCLUSION

[12] Our examination of the structure of the FCA, the holdings in *Mortgages* and *Madden*, the settlement agreement in *Marchese*, and the nature of CTI's claims against Lash leads us to conclude that CTI's claims should not have been dismissed at the pleading stage. The district court should reconsider whether the claims are independent and, for third party claims that are not independent, should assess how to proceed in light of our holding that the Settlement Agreement does not constitute a finding of liability under the FCA. We make no judgment regarding the timeliness or the ultimate viability of what Lash characterizes as CTI's untimely supplemental disclosure regarding its $12.3 million in alleged business losses.

The reasons for restricting the ability of a qui tam defen-

---

[6]*See, e.g.*, Kaz Kikkawa, Note, *Medicare Fraud and Abuse and Qui Tam: The Dynamic Duo or the Odd Couple?*, 8 Health Matrix 83, 122 (1998) ("[N]egative publicity, the large potential penalties involved, and availability of reimbursement of attorneys fees all encourage the settlement of claims. Few cases are litigated to completion, thus creating little judicial precedent."); Joseph P. Tomain, *False Claims Act Litigation: Whistleblower Qui Tam Suits Against Contractors Who Cheat the Government*, 47 Admin. L. Rev. 299, 301 (1995) (observing that "there often is pressure for the government to settle with the contractors to the relator's detriment").

dant to seek recovery against a relator are not in play here. In *Mortgages*, the qui tam defendants' counterclaims for indemnification ran afoul of the FCA's "comprehensive procedures for enforcement, including a provision to limit the reward of a qui tam plaintiff if the court determines that party is also a wrongdoer." 934 F.2d at 213 (citing 31 U.S.C. § 3730(d)(3)). The need we identified in *Madden* to ensure that relators do not engage in wrongful conduct is no more acute than the need to ensure that third parties do not avoid liability for their wrongful conduct, even if the party wronged is a qui tam defendant. *See* 4 F.3d at 831. Unlike the FCA provisions that restrict or prevent entirely the ability of a relator with unclean hands to collect a qui tam bounty, 31 U.S.C. § 3730(d), or allow a prevailing defendant to recover reasonable attorneys' fees if the qui tam action was brought in bad faith, *id.* § 3730(d)(4), there are no counterpart or comprehensive procedures in the FCA to address the wrongdoing of a non-relator third party. That gap is not surprising under the FCA structure. Here, Lash is not a relator nor did it bring qui tam claims against CTI.

In addition, unlike *Mortgages*, this case does not present the threat of chilling future suits by qui tam relators, who may collect their bounties regardless of whether the qui tam defendant seeks relief from a third party. To the extent that some courts have interpreted *Mortgages* to foreclose qui tam defendants from bringing claims against third parties, we respectfully disagree with that gloss on the case.[7] *Mortgages* did not

---

[7]*See, e.g.*, *United States v. Dynamics Research Corp.*, 441 F. Supp. 2d 259, 264 (D. Mass. 2006) (applying *Mortgages* to non-relators on the ground that "nothing in the Ninth Circuit's federal common law analysis [in Mortgages] suggests that the court would have arrived at a different conclusion if the potential indemnitee had been a third party . . . instead of a qui tam plaintiff"). *Cf. Israel Disc. Bank Ltd. v. Entin*, 951 F.2d 311, 315 n.9 (11th Cir. 1992) (citing *Mortgages* in dicta and assuming without deciding that an action by a qui tam defendant against a third party could have been dismissed because "there is no right to indemnity or contribution under the FCA").

address that issue. We do so here, however, and hold that qui tam defendants may bring third party claims under the circumstances outlined in this opinion.

**REVERSED and REMANDED** for proceedings consistent with this opinion.